# IN RE STOLAR

No. 18.  Argued December 9, 1969—Reargued October 14–15, 1970—
Decided February 23, 1971

BLACK, J., announced the Court's judgment and delivered an opinion in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined. STEWART, J., filed an opinion concurring in the judgment, *post*, p. 31. HARLAN, J., filed a dissenting opinion, *post*, p. 34. WHITE, J., filed a dissenting opinion, *ante*, p. 10. BLACKMUN, J., filed a dissenting opinion in which BURGER, C. J., and HARLAN and WHITE, JJ., joined, *post*, p. 31.

*Leonard B. Boudin* reargued the cause for petitioner. With him on the briefs was *David Rosenberg.*

*Robert D. Macklin,* Assistant Attorney General, reargued the cause for the State of Ohio and the Columbus Bar Association. With him on the brief were *Paul W. Brown,* Attorney General, *Shelby V. Hutchins,* and *William H. Schneider.*

MR. JUSTICE BLACK announced the judgment of the Court and delivered an opinion in which MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join.

This is the second of two cases* involving the refusal of States to admit applicants to practice law because they declined to answer questions relating to their beliefs about government and their affiliations with organizations suspected of advocating the overthrow of government by force. These cases, which concern inquisitions about loyalty and government overthrow, are relics of a turbulent period known as the "McCarthy era," which drew its name from Senator Joseph McCarthy from Wisconsin. We have just referred in our opinion in *Baird* v. *State Bar of Arizona, ante,* p. 1, to the confusion and uncertainty created by past cases in this constitutional field. The central question in all of them has been the same, whether involving lawyers, doctors, marine workers,

---

*The other is No. 15, *Baird* v. *State Bar of Arizona, ante,* p. 1. Cf. No. 49, *Law Students Civil Rights Research Council* v. *Wadmond, post,* p. 154.

or State or Federal Government employees, namely: to what extent does the First or Fifth Amendment or other constitutional provision protect persons against governmental intrusion and invasion into private beliefs and views that have not ripened into any punishable conduct? Without attempting in that case to bring about a complete reconciliation of all that this Court has previously said about this particular phase of First Amendment protection, we held that under the circumstances present there, Mrs. Baird could not, consistently with the First Amendment, be denied a state license to practice law because she refused to state whether she had belonged to the Communist Party or any organization that advocated overthrow of the United States Government by force. Here we hold that Stolar's refusals to answer certain questions asked him by the Ohio Bar Committee were also protected by the First Amendment.

The facts are these: Stolar, whose home is in Rochester, New York, has an A. B. degree from the University of Rochester and received an LL. B. degree from New York University Law School in 1968. The dean of that school has certified that Stolar has received instructions in legal ethics, has a good moral character, and has sufficient knowledge and ability to discharge the duties of an attorney at law. He has a license to practice law in New York State. To become a member of the New York Bar, Stolar was asked and answered the following questions, along with many others:

"18. State whether you have participated in activities of a public or patriotic nature or in philanthropic, religious, or social services? If so, state the facts fully.

"*I was a Cub Scout and Boy Scout and Explorer Scout during elementary and high school.*

"*I also participated fully in my Temple's religious education programs until I went to college.*

*"In addition, my time spent as a VISTA is a service of the above described nature.*

"19. Do you believe in the principles underlying the form of government of the United States? *Yes.*

"20. *State whether you have been or are a member of any party or organization engaged in propagating or pledged to effect changes in the form of government provided for by the United States Constitution, or in advancing the interests of a foreign country?* If so, state the facts fully. *No.* (Emphasis supplied in part.)

"21. Can you conscientiously, and do you, affirm, without any mental reservation, that you have been and are loyal to the Government of the United States? *Yes.*

.     .     .     .     .

"24. (a) Have you studied the Canons of Ethics adopted by the American Bar Association? *Yes.*

"(b) Do you unconditionally subscribe to the same? *Yes.*

"(c) Will you conscientiously endeavor to conform your professional conduct to them? *Yes.*"

In 1969 Mr. Stolar applied to the Ohio Bar for admission to practice. He made available to Ohio all the information he had previously given the New York Bar Committee, including his answers to the New York questions stated above. Stolar then answered a long series of questions posed by the Ohio committee. In response to oral interrogation he stated:

"that he is not now and has never been a member of the Communist Party, of any socialist party, or of the Students for a Democratic Society, and . . . that he has signed the standard U. S. Army preinduction security oath, which has reference to the 'Attorney General's List.' "

However, Stolar declined to answer certain questions on the Ohio application on the grounds they infringed his rights under the First and Fifth Amendments. These questions were:

"12. State whether you have been, or presently are . . . (g) a member of any organization which advocates the overthrow of the government of the United States by force . . . .

"13. List the names and addresses of all clubs, societies or organizations of which you are or have been a member."

"7. List the names and addresses of all clubs, societies or organizations of which you are or have been a member since registering as a law student."

Because of his refusal to answer these questions, one member of the committee who investigated Stolar recommended that he be denied admission. The other stated:

"I found Mr. Stolar to be honest and forthright. His statements evidenced also a certain commitment to principle for its own sake, an unusually great amount of social awareness, and a degree of self-interest not reprehensible. On the basis of the interview and the background actually revealed in Mr. Stolar's applications I have no reluctance to recommend Mr. Stolar for admission to the practice of law."

The full committee then recommended that petitioner's application to take the Ohio Bar examination be denied. The Ohio Supreme Court approved the committee's recommendation without opinion. We granted certiorari. 396 U. S. 816.

We deal first with Ohio's demands that petitioner Martin Stolar list all the organizations to which he has belonged since registering as a law student and those of which he has ever been a member. In our view re-

quiring a Bar applicant to answer these questions is impermissible in light of the First Amendment, as was made clear in *Shelton* v. *Tucker,* 364 U. S. 479 (1960). At issue in *Shelton* was an Arkansas statute that required every state teacher, as a condition of employment, to file an affidavit listing every organization to which he had belonged within the preceding five years. The Court noted that this requirement impinged upon the teacher's right to freedom of association because it placed "pressure upon a teacher to avoid any ties which might displease those who control his professional destiny . . . ." *Id.,* at 486. Similarly here, the listing of an organization considered by committee members to be controversial or "subversive" is likely to cause delay and extensive interrogation or simply denial of admission to the Bar. Respondent committee frankly suggests that the listing of an organization which it felt "espoused illegal aims" would cause it to "investigate further." Law students who know they must survive this screening process before practicing their profession are encouraged to protect their future by shunning unpopular or controversial organizations. Cf. *Speiser* v. *Randall,* 357 U. S. 513 (1958).

The committee suggests its "listing" question serves a legitimate interest because it needs to know whether an applicant has belonged to an organization which has "espoused illegal aims" and whether the applicant himself has espoused such aims. But the First Amendment prohibits Ohio from penalizing an applicant by denying him admission to the Bar solely because of his membership in an organization. *Baird* v. *State Bar of Arizona, supra; cf. United States* v. *Robel,* 389 U. S. 258, 266 (1967); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 607 (1967). Nor may the State penalize petitioner solely because he personally, as the committee suggests,

"espouses illegal aims." See *Cantwell* v. *Connecticut*, 310 U. S. 296, 303–304 (1940); *Baird* v. *State Bar of Arizona, supra.*

The committee also argues it needs answers to Questions 7 and 13 because responses might direct its attention to persons who have known an applicant and who could supply information relevant to his qualifications. Undoubtedly Ohio has a legitimate interest in determining whether an applicant has "the qualities of character and the professional competence requisite to the practice of law." *Baird* v. *State Bar of Arizona, supra.* But petitioner Stolar, already a member in good standing of the New York Bar, supplied the Ohio committee with extensive personal and professional information as well as numerous character references to enable it to make the necessary investigation and determination. Moreover, even though irrelevant to his fitness to practice law, Stolar's answers to questions on the New York application provided Ohio with substantially the information it was seeking by Questions 7, 12 (g), and 13. The information contained in the two applications included petitioner's law school; every address at which he had ever lived; the names, addresses, and occupations of his parents; the names and addresses of his elementary school, his high school and high school principal; the names of nine former employers (which included three different law firms for which he had done summer work); his "criminal record" (which consisted of two speeding convictions); nine different people as character references (two of whom had known Stolar for more than 20 years); and extensive information about his previous activities (*e. g.,* law school moot court, graduate advisor at N. Y. U., Cub Scout, Boy Scout, Explorer Scout, and his temple's religious education programs).

We conclude also that Ohio may not require an applicant for admission to the Bar to state whether he has been or is a "member of any organization which advocates the overthrow of the government of the United States by force." As we noted above, the First Amendment prohibits Ohio from penalizing a man solely because he is a member of a particular organization. See also *Baird* v. *State Bar of Arizona, supra.* Since this is true, we can see no legitimate state interest which is served by a question which sweeps so broadly into areas of belief and association protected against government invasion. *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304 (1940); *United States* v. *Robel,* 389 U. S. 258, 266 (1967); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 607 (1967); *Baird* v. *State Bar of Arizona, supra; Baggett* v. *Bullitt,* 377 U. S. 360 (1964).

There is not one word in this entire record that reflects adversely on Mr. Stolar's moral character or his professional competence. Although there were three questions that he did not answer with a simple "yes" or "no," he did answer all of the Committee's questions relevant to his fitness and competence to practice law. It is difficult if not impossible to see how the State of Ohio could have been obstructed or frustrated to any extent in determining Mr. Stolar's fitness to practice law by his failure to answer the questions more fully. The record shows a young man who, from his boyhood up, had no adverse marks except for two speeding convictions. He answered numerous prying questions about personal affairs that could hardly have been necessary for a State interested only in whether he would make an honest lawyer faithful to his clients. The questions he did not answer related only to his beliefs and associations, both protected by the First Amendment. The State points to not one overt act on Stolar's part that even suggests a possible reason for denying his appli-

cation. Here, as in *Baird* v. *State Bar of Arizona,* it was a denial of a Bar applicant's First Amendment rights to refuse him admission simply because he declined to answer questions about his beliefs and associations.

The judgment of the Ohio Supreme Court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

[For dissenting opinion of MR. JUSTICE WHITE, see *ante,* p. 10.]

MR. JUSTICE STEWART, concurring in the judgment.

Ohio's Questions 7 and 13 are plainly unconstitutional under *Shelton* v. *Tucker,* 364 U. S. 479. In addition, Question 12 (g) suffers from the same constitutional deficiency as does Arizona's Question 27 in *Baird* v. *State Bar of Arizona, ante,* p. 1. For these reasons I agree that the judgment before us must be reversed.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE HARLAN, and MR. JUSTICE WHITE join, dissenting.

This case, also argued here for the second time, presents another instance of a well-educated (academic degree from the University of Rochester; law degree from New York University) and obviously able young person who seeks admission to the Bar, but, to an extent at least, upon his own terms. His case is made the more acute and appealing because he already has been admitted to practice in the State of New York but now finds himself thwarted in a like endeavor in Ohio. The decisions in *Konigsberg* v. *State Bar,* 366 U. S. 36 (1961), and *In re Anastaplo,* 366 U. S. 82 (1961), are again challenged.

The plurality opinion has set forth the pertinent questions asked of Martin Robert Stolar, when he sought admission to the New York Bar in 1968, and Stolar's answers to those questions. At that time he was willing to go so far as specifically to profess even his *belief* in the principles underlying the form of government of the United States and his loyalty to that government, and also, just as specifically, to go so far as to deny that he was, or ever had been, a member of any party or organization pledged to effect changes in the form of our government or engaged in advancing the interest of a foreign country. The propriety of these very questions, which Stolar answered apparently without hesitation in New York in 1968, was seriously questioned subsequently in *Law Students Civil Rights Research Council* v. *Wadmond*, 299 F. Supp. 117, 130 (SDNY 1969), now affirmed, *post*, p. 154.

In 1969, in Ohio, Stolar apparently again had no hesitation in professing at oral interview that he was not, and never had been, a member of the Communist Party. But, although the one seems to include the other, he flatly refused, on stated Fifth Amendment grounds, to say (Question 12 (g)) whether he was or had been a member of any organization which advocates the overthrow of the Government of the United States by force. He also refused, on Fifth Amendment grounds, to list (Questions 13 and 7) organizations of which he was or had been a member.

I may assume, for present purposes, that the general and broadly phrased list-your-organizations inquiries, that is, Questions 13 and 7, are improper and impermissible under the Court's holding, by another five-to-four vote, in *Shelton* v. *Tucker*, 364 U. S. 479 (1960), despite the presence of what seems to me to be a somewhat significant difference between nontenured school teachers and about-to-be-licensed attorneys. This assumption,

however, does not terminate Stolar's case, for Question 12 (g), with its specific inquiry about membership in organizations advocating overthrow by force, remains to be considered.

My position with respect to a refusal to respond to a question such as Question 12 (g) is set forth in my dissent in *Baird* v. *State Bar of Arizona, ante,* p. 11, and needs no detailed repetition here. I note only (a) the inconsistency of Stolar's willingness to respond orally and his unwillingness to respond in writing, and (b) that, here again, membership, present or past, in an organization of the kind specified, although relevant in the Bar admission context, in and of itself is not conclusive upon the issue of admission to the Bar. Ohio concedes, as Arizona did in *Baird,* that the significance lies in something more than mere membership.

Neither am I content with the conclusion reached in the plurality opinion that Stolar's responses to New York in 1968 should suffice for responses to Ohio in 1969. That kind of reasoning would compel one to conclude that because an applicant is admitted to the Bar of one State, he surely must be admitted to the Bar of any other State. We might reach that frontier one day on some new and as yet undeveloped constitutional concept, but I doubt whether we have reached it yet. New York's range of inquiry and her area of particular interest may very well differ from Ohio's, and each may be constitutionally permissible. Further, an answer true in 1968 may not be true at all in 1969. Time passes and changes can take place even within a few months.

Although I readily concede that the Ohio question (just as the Arizona question in *Baird*) could have been better phrased, the approach of the plurality for reversal to the inquiry is, I feel, somewhat unrealistic. As in *Baird,* and as noted above, it is not a mere question of membership present or past. It is a question of knowing

membership and of willingness to participate in the forceful destruction of government. This is the crux. To forestall inquiry at the threshold stultifies Ohio's appropriate concern as to faithful adherence to a lawyer's trust when the State is about to vest great professional and fiduciary power in those who seek entrance to the Bar.

On this record, I would affirm.

MR. JUSTICE HARLAN, concurring in No. 49, *post,* p. 154, and dissenting in No. 15, *ante,* p. 1, and No. 18.

In joining MR. JUSTICE STEWART'S opinion for the Court in the *Wadmond* case, No. 49, *post,* p. 154, and MR. JUSTICE BLACKMUN'S dissenting opinions in the *Baird* case, No. 15, *ante,* p. 11, and in the present case, I am constrained to add these remarks.*

My Brother BLACK's opinion announcing the judgments of the Court in *Baird* and in the present case, and his dissenting opinion in the *Wadmond* case, could easily leave the impression that the three States involved are denying Bar admission to professionally qualified candidates solely by reason of their membership in so-called subversive organizations, irrespective of whether that membership is born of a purely philosophical cast of mind or of a specific purpose to engage in illegal action, or that these States are at least trying to discourage prospective Bar candidates from joining such organizations. In the latter respect, my Brother MARSHALL's opinion, *post,* p. 185, seems to me to lend itself to a similar interpretation. If anything in these records could fairly be taken as pointing to either such conclusion, I would be found on the "reversing" side of these cases. The records, however, adum-

---

*While petitioners in Nos. 15 and 18 have also sought to assert Fifth Amendment claims against self-incrimination, today's opinions have treated all the cases only in terms of First Amendment considerations, and I too shall proceed on that basis.

brated by the representations of the responsible lawyers who appeared for the States, in my opinion belie any such inferences. They show no more than a refusal to certify candidates who deliberately, albeit in good faith, refuse to assist the Bar-admission authorities in their "fitness" investigations by declining fully to answer the questionnaires.

I could hardly believe that anyone would dispute a State's right to refuse admission to the Bar to an applicant who avowed or was shown to possess a dedication to overthrowing governmental authority by force or to supplanting the rule of law by incitement to individual or group violence as the best means of attaining desired goals. One could question the efficacy or wisdom of questionnaires of the kind involved in these cases as a means of weeding out occasional misfits from the general run of Bar candidates, or criticize as unduly complicated or pervasive some aspects of such questionnaires. And one may also be understanding of the considerations which in this day and age breed lawsuits like these. But we should nonetheless take care lest the indulging of such points of view lead us into warped constitutional decision.

In my opinion the course chosen by these States cannot be said to be forbidden by the Constitution. I do not consider that the "less drastic means" test which has been applied in some First Amendment cases, see *NAACP v. Alabama*, 377 U. S. 288, 307–308 (1964), and cases cited therein, suffices to justify this Court in assuming general oversight of state investigatory procedures relating to Bar admissions. Nor do I think that the questioning of candidates as to their beliefs in violent overthrow necessarily runs afoul of true First Amendment concerns. I do not dispute that the First Amendment, as reflected in the Fourteenth, prevents States from denying admission to candidates merely because of theoretical beliefs in the "right" of revolution, but I do maintain that there

is no constitutional barrier to denying admission to those who seek entry to the profession for the very purpose of doing away with the orderly processes of law, and that temperate inquiry into the character of their beliefs in this regard, which is all that is shown here, is a relevant and permissible course to that end. It seems to me little short of chimerical to suggest that the independence of the Bar is threatened unless this Court steps in and puts a constitutional end to such a practice. Cf. *Bates* v. *Little Rock,* 361 U. S. 516 (1960); *Barenblatt* v. *United States,* 360 U. S. 109 (1959).

While I hope that I am no less sensitive than others on the Court to First Amendment values, I must say that the pervasive supervision over state Bar admission procedures which is now asked of us would work a most extravagant expansion of the current "chilling effects" approach to First Amendment doctrine. Knowing something of the great importance which the New York Bar attaches to the independence of the individual lawyer, I have little doubt but that the candidates involved in *Wadmond* will promptly gain admission to the Bar if they straightforwardly answer the inquiries put to them without further ado. And I should be greatly surprised if the same were not true as to Mrs. Baird and Mr. Stolar in Arizona and Ohio. But if I am mistaken and it should develop that any of these candidates are excluded simply because of unorthodox or unpopular beliefs, it would then be time enough for this Court to intervene.