Woodrow Slocum, Plaintiff-Appellant, v. The Fire and Police Commission of the City of East Peoria, Defendant-Appellee.

(No. 72-45;

Third District—November 16, 1972.

STOUDER, P. J., dissenting.

James Hatcher, of Peoria, for appellant.

Robert V. Clevenger, of Pekin, for appellee.

Mr. JUSTICE DIXON delivered the opinion of the court:

This is an appeal from a judgment of the Circuit Court of Tazewell County, Illinois, affirming a decision of the Fire and Police Commission of the City of East Peoria. The Commission had suspended Patrolman Woodrow Slocum from duty for thirty days without pay for disobeying orders to wear an American flag emblem on the sleeve of his police uniform.

A complaint filed with the Commission had alleged that Patrolman Slocum had refused to obey an acting sergeant's verbal order and the chief of police's written order to wear the American flag emblem on his shirt. A hearing on the complaint was held by the Commission, and it was brought out that flag emblems had been issued to all policemen in the department without cost; that Acting Sergeant Russell Hale had reminded all the others to have their flags on; that an order of Chief of Police Vern Roberson requiring the wearing of "dept. emblem on left sleeve and flag on right, both at shoulder," appeared in the department's Daily Bulletin; that Woodrow Slocum told Sergeant Hale he had read

the order, understood it, believed it was improper, and would not comply with it; that Woodrow Slocum wrote a letter to Chief Roberson stating that he did not wish to wear the flag; and that he thereafter reported for duty without the flag.

The Commission found that Woodrow Slocum had wilfully disobeyed a Departmental order and the order of a superior officer, and gave him a thirty-day suspension on his representation that he would commence wearing the flag as ordered. A complaint for administrative review was then filed; the Commission's decision was upheld; and this appeal followed.

Woodrow Slocum takes the position that wearing the flag is symbolic speech; that displaying a flag on one's shirtsleeve is like confessing allegiance to the United States, and this cannot be required of anyone under the First and Fourteenth Amendments; that the flag itself is an extension of political discussion and arouses the hostility of some persons, and it is both unreasonable and unconstitutional to require a policeman to indicate approval of what the flag says by wearing a flag emblem on his sleeve; and that no adequate public interest exists to justify depriving a policeman of his right not to confess allegiance, and his right not to say what the flag says, by making him wear a flag. He maintains, further, that the order to wear the flag was vague; that he was not given a fair hearing; that the evidence was insufficient; and that the Illinois legislative scheme providing greater rights in disciplinary proceedings for policemen in municipalities of more than 500,000 population than for policemen in smaller cities violates the Equal Protection Clause of the Fourteenth Amendment.

The Fire and Police Commission, on the other hand, maintains that a municipality has the right to prescribe the kind of uniform to be worn by policemen; that it is reasonable to utilize an emblem which relates a policeman to government and in particular the government of the United States, because of the variety and significance of his contacts with national law and his importance to the nation; that the wearing of a flag emblem is therefore a reasonable condition of employment; that this emblem would not make a policeman seem any more or less the enemy of law violators or dissenters in our society; that the orders given were not vague, nor the hearing fundamentally unfair, nor the evidence in any way insufficient; and that the Equal Protection argument cannot now be made because not included in the specification of errors filed in the administrative review proceedings in the Circuit Court, but the legislative classification is nevertheless supportable.

Woodrow Slocum cites, among other cases, *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, in which the United States Su-

preme Court held that a flag salute and pledge of allegiance could not be required of public school pupils. However, we are not persuaded that a policeman's wearing a flag as part of his uniform is symbolic speech to nearly the same degree as a schoolchild's flag salute. It would seem to indicate more about the thinking of the policeman's superiors who specified the requirement, than the thinking of the wearer. A blue uniform does not tell us that the wearer's favorite color is blue. If a flag on a uniform is carrying a message of some kind, it might to most persons be simply that the wearer is a member of a subordinate unit of government of the United States of America, without there being political overtones of any kind to which objection could be made. Our thinking along this line is well expressed in *Parker v. Morgan,* 322 F.Supp. 585, where it was said:

> "We reject plaintiff's argument that because the national flag is a symbol it is always 'saying' something, and because it says something control of its display and usage is outlawed by the freedom of speech clause of the First Amendment. The argument is based on a false premise: that what the flag stands for can be authoritatively stated, *i.e.,* that it represents government and/or official policy. If the flag says anything at all, and we agree it often may in a given context, we think it says everything and is big enough to symbolize the variant viewpoints of a Dr. Spock and a General Westmoreland. With fine impartiality the flag may head up a peace parade and at the same time and place fly over a platoon of soldiers assigned to guard it.
>
> The flag has never been a trademark of government. It is not 'official' in the sense that its display is limited to the Army or the Navy or to public buildings or for state occasions. It no more belongs to the President than it does to the most private citizen. It may be flown, and often is, over the YMCA and the Jewish synagogue, the Peace Corps and the Army post, the American Federation of Labor and General Motors. It belongs as much to the defeated political party, presumably opposed to the government, as it does to the victorious one. Sometimes the flag represents government. Sometimes it may represent opposition to government. Always it represents America—in all its marvelous diversity."

If to some persons, however, the wearing of a flag has political implications of one kind or another, or signifies a pledge of allegiance, consideration should be given to whether a policeman has valid constitutional grounds for objecting to wearing a flag emblem. The United States Supreme Court has indicated that where symbolic speech is involved there

are a number of factors to be weighed. In *United States v. O'Brien,* 391 U.S. 367, it said: "This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a governmental regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

The requirements of *United States v. O'Brien* have been considered by a federal court recently in a case upholding the Illinois flag desecration statute, *Sutherland v. DeWulf,* 323 F.Supp. 740. In that case the question was not whether wearing the flag could be compelled but whether burning the flag in public could be prohibited. Freedom of speech was again claimed. After mentioning that the primary justification of such flag acts has been preventing breaches of the peace, the court continued:

"This court also believes that the state has a second interest in punishing the public burning of the flag which meets the constitutional tests set forth in *O'Brien.* That interest is the preservation of the flag as a symbol of national unity on the ideals and purposes of the nation.

History has shown that one of the incidents of nationality is the adoption of a national flag or other symbol. Our own country, early in its history, adopted a flag to represent its existence and sovereignty as a nation. The importance of this flag in developing a sense of loyalty to our nation and its ideals from its incipient stages down to the present is without question. When a state enacts legislation, as in this case, to punish the public mutilation of the flag that has represented this country throughout its history, the state is aiding in the development and extension of a unity of purpose within the nation. In so doing, it necessarily benefits itself, as well as the nation, for the state is indissolubly connected to the Union. (*Halter v. Nebraska* (1907), 205 U.S. 34, 43, 27 S.Ct. 419.) This interest of the State of Illinois in protecting the flag from public mutilation is clearly important enough to justify any incidental limitation on the right to free speech as is involved here. The public mutilation of the flag would 'degrade and cheapen the

flag in the estimation of the people, as well as to defeat the object of maintaining it as an emblem of national power and national honor.' *Halter v. Nebraska, supra* at 42, 27 S.Ct. at 422.

It is also clear that this state interest like the preservation of the public peace, is unrelated to the suppression of free expression. The statutory provision challenged in this case does not significantly curtail speech. It certainly does not have 'the effect of entirely preventing a "speaker" from reaching a significant audience with whom he could not otherwise lawfully communicate.' See *United States v. O'Brien, supra* at 388-389, 88 S.Ct. at 1685 (Mr. Justice Harlan concurring). Although it is purely speculative what the plaintiffs in this case were trying to express, if anything, this court is certain that they could have conveyed whatever message they may have had in many ways other than burning the flag.

The final requirement under the *O'Brien* test is that the incidental restriction on alleged First Amendment freedoms be no greater than is essential to the furtherance of the interest sought to be protected. Here, it appears clear to this court that the State of Illinois has at least two sufficiently important interests to justify an incidental restriction on free speech. Any restriction, or even possible chilling effect, placed on free speech in furtherance of these valid state interests by punishing the act of knowingly burn-the flag in public is minimal. As stated above, the plaintiffs could have conveyed any possible idea that they may have intended to any conceivable audience by means other than burning the flag in a public place. The guarantee of free speech is more concerned with the *substance* of that speech than the *form* of the communication. Cf. *United States v. O'Brien, supra*."

Other federal cases explain that even in the area of pure speech, "* * * it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance * * *." *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563. (See also *Miller v. Conlisk*, 429 F.2d 901.) Furthermore, the United States Supreme Court has held, in *Garner v. Board of Public Works of the City of Los Angeles*, 341 U.S. 716, that a city's ordinance requiring its employees to take a loyalty oath is valid as "a reasonable regulation to protect the municipal service by establishing an employment qualification of loyalty to the State and the United States." Loyalty oaths like this continue to be upheld. See

*Law Students Civil Rights Research Council, Inc., v. Wadmond,* 401 U.S. 154.

■■ From the foregoing we conclude that the wearing of a flag emblem can be required of Woodrow Slocum. A flag on a uniform has a minimal and ambiguous speech element. The flag does, however, tend to develop a sense of loyalty to the nation. We regard this as an important governmental interest. Since a municipality has the power to prescribe a uniform for its police force, and since display of the flag tends to promote an important governmental interest, a flag emblem may be made part of the uniform. The municipality's promoting patriotism in this way does not prevent the wearer of the emblem from communicating verbally his ideas on political or any other matters. Wearing the flag may conceivably be considered by some to be an implicit, non-verbal oath of allegiance. A policeman cannot complain of this because he can be required to take an express, verbal oath of allegiance. We find no constitutional infirmity in the orders given Woodrow Slocum to wear the flag.

■■ Woodrow Slocum claims that the orders were vague, but from the record it is clear that he understood the orders yet chose not to obey them. He urges that the hearing was unfair, but the record indicates that he chose to proceed without counsel and was given some amount of assistance and latitude in presenting his case because he did not have an attorney. He argues that the case against him was not proved because Chief Roberson's order was incorrectly described in the complaint before the Commission as a Departmental order; his brief says: "What Plaintiff disobeyed were orders, pure and simple." However, the charges did not have to be drawn with the same precision as pleadings in judicial actions. (*Sudduth v. Board of Fire and Police Commissioners of the City of Rockford,* 48 Ill.App.2d 194.) Disobedience of a superior officer's order, however it may be described, is cause for suspension (*Zinser v. Board of Fire and Police Commissioners of the City of Belleville,* 28 Ill.App.2d 435), or for discharge. *Coursey v. Board of Fire and Police Commissioners of the Village of Skokie,* 90 Ill.App.2d 31.

Woodrow Slocum's argument directed against the legislature's classification of municipalities by size need not be considered by us, because this argument was not presented to the Circuit Court in the specification of errors Woodrow Slocum filed as ordered pursuant to Section 9, subsection (a), of the Administrative Review Act. See *Bagat v. Police Board of the City of Chicago,* 95 Ill.App.2d 45, 50.

For the reasons given, the judgment of the Circuit Court of Tazewell County is affirmed.

Judgment affirmed.

SCOTT, J., concurs.

Mr. PRESIDING JUSTICE STOUDER dissenting:

I do not agree with the majority of the court. Personal liberty has been considered the genius of our governmental organization and freedom of speech is the *sine quo non* upon which all personal liberties are based. With respect to the exercise of freedom of speech including the rights of political and personal belief I believe that police officers are not and ought not to be regarded as second class citizens (*Muller v. Conlisk*, (7th Cir. 1970), 429 F.2d 901), any more than high school teachers (*Pickering v. Board of Education* (1968), 391 U.S. 563, 20 L.Ed.2d 811, 88 S.Ct. 1731), university faculty members (*Keyishian v. Board of Regents* (1967), 385 U.S. 589, 17 L.Ed.2d 62, 87 S.Ct. 675), state legislators, (*Bond v. Floyd* (1966), 385 U.S. 116, 17 L.Ed.2d 235, 87 S.Ct. 339), or law students seeking admission to the bar. *Law Students Civil Rights Research Council, Inc. v. Wadmond* (1971), 401 U.S. 154, 27 L.Ed.2d 749, 91 S.Ct. 720, and *Baird v. State Bar of Arizona* (1971), 401 U.S. 1, 27 L.Ed.2d 639, 91 S.Ct. 702.

My only disagreement with the opinion of the majority relates to the interpretation and application of first amendment rights. Otherwise I concur in the observations of the majority regarding the procedures before the Board.

Prior to the institution of this proceeding Slocum had been a member of the East Peoria Police Department for five years. He had previously served for five years on active duty with the U.S. Air Force, had been in the Air Force reserves for twelve years and was a member of the reserves at the time of this incident. There is no intimation in the record that Slocum's prior service with the East Peoria Police Department was other than competent, efficient and satisfactory or is any doubt cast on the faithful performance of his duties.

Another aspect of the factual background is the manner in which the wearing of the flag patch requirement evolved. In the autumn of 1969, members of the East Peoria Police Department discussed the wearing of American flag emblems on their uniform sleeves. In October such emblems were ordered and upon arrival in December were paid for by the City of East Peoria. Officer Slocum from the beginning made known his desire not to wear the emblem for personal reasons, stating among other reasons that he conscientiously did not desire in that manner to make the political or patriotic statement underlying the movement toward wearing the flag emblem.

Officer Slocum declined a tender of a packet of emblems on December 14, 1969, with a note to the Chief of Police that he did not desire to wear the flag emblems. Other officers did however sew the emblems on their sleeves, some on the left sleeves and some on the right, so that in Feb-

ruary, 1970, the officers met with the Chief to determine on which sleeve the flags were to be worn. It was determined that all flag emblems would be sewn on the right sleeve by May 1, 1970.

On May 1, 1970, Slocum reported for work and was informed by his superior that he had three days to have the flag emblem sewn on his sleeve. Slocum noted and the Sergeant agreed that no order in writing had been issued making the wearing of the flag mandatory. However, upon reporting to work and reading the Daily Bulletin on May 5, 1970, as required, Slocum noted the following entry: "ATTENTION ALL POLICE: Uniform shall be light blue short sleeve shirts with proper emblems displayed. Dept. Emblem on left sleeve and the Flag on right, both at shoulder. All police will be given three days to comply, by May 7, 1970. No dark shirts to be worn by anyone, at any time. Orders of Chief Roberson".

On May 5, 1970, Slocum wrote a letter to the Chief asking that the order be reconsidered since (1) he did not wish to wear the flag for personal reasons and (2) the order was not a proper and lawful order. On May 25, 1970, a formal complaint was filed against Slocum.

There can be no doubt but that the flag is symbolic speech and by its very nature is communicative of ideas, goals and beliefs. Within the ambit of freedom of speech protected by the first amendment compulsory speech or expression of belief is just as proscribed as the prohibition or repression of speech. At this juncture I believe it appropriate to observe that in the consideration, interpretation and application of first amendment principles courts are not determining or expressing approval of the wisdom or virtue of the speech sought to be protected.

In my opinion *West Virginia State Board of Education v. Barnette* (1943), 319 U.S. 624, 87 L.Ed. 1628, 63 S.Ct. 1178; *Pickering v. Board of Education* (1968), 391 U.S. 563, 20 L.Ed.2d 811, 88 S.Ct. 1731, and *Muller v. Conlisk* (1970), 429 F.2d 901, are persuasive authorities requiring and justifying the conclusion that the order was constitutionally impermissible. In the leading case of *West Virginia State Board of Education v. Barnette* (1943), 319 U.S. 624, 87 L.Ed. 1628, 63 S.Ct. 1178, the court held constitutionally impermissible the requirement that school children pledge allegiance to or salute the flag observing:

> "The case is made difficult not because the principles of its decision are obscure but because the flag involved is our own. Nevertheless, we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization. * * * [F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its sub-

stance is the right to differ as to things that touch the heart of the existing order.

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us."

Our traditional commitment, freedom of speech and unrestrained expression of belief or opinion has ebbed and flowed somewhat in accord with the nature and vigor of the controversies inherrent in our social system. Even though unrestrained discussion may be deemed as an abstract proposition to have fundamental importance in our social organization nonetheless the ardor that certain ideas ought to prevail may lead to the desire to limit or eliminate opposing views from the arena.

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." *De Jonge v. Oregon*, 299 U.S. 353, 81 L.Ed. 278, 57 S.Ct. 255.

The principal question posed on this appeal is when and to what extent may the State or one of its agencies limit or impose restrictions on the expressions of opinion or belief of its employees. Admittedly the State and its departments and agencies as employer may require subordinate employees to obey and conform to the orders and directives of those in charge. However the question remains as to whether the rule of obedience or its converse insubordination may be invoked to punish or penalize an employee for holding or expressing beliefs contrary to those of his superior or those in charge of the governmental agency. "A citizen's right to engage in protected expression or debate is substantially unaffected by the fact that he is also an employee of the government and, as a general rule, he cannot be deprived of his employment merely because he exercises those rights. This is so because dismissal from government employment, like criminal sanctions or damages, may inhibit the propensity of a citizen to exercise his right to freedom of speech and association. [Citation.] To protect society's interest in uninhibited and robust debate the first amendment demands that the government be pro-

hibited from inhibiting or suppressing speech by indirection through discharge of a government employee when the same objective could not constitutionally be achieved by criminal sanctions or other direct means." *Kilskila v. Nichols* (1970), 433 F.2d 745.

*Pickering v. Board of Education* (1968), 391 U.S. 563, 20 L.Ed.2d 811, 88 S.Ct. 1731, and *Muller v. Conlisk* (1970), 429 F.2d 901, deal directly with this problem, describing the tests or guides to be followed and conclude in each case that the State had unconstitutionally limited the first amendment rights of the employees. To the same effect is *Donahue v. Staunton*, U.S. Court of Appeals (2d Cir. 1972) Docket No. 71-1160.

In *Pickering v. Board of Education* (1968), 391 U.S. 563, 20 L.Ed.2d 811, 88 S.Ct. 1731, a school teacher whose letter to a newspaper was critical of school board policies was discharged by the Board because such conduct was "detrimental" to the school system. In holding the teacher's first amendment rights had been violated the court observed, "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." Although declining to establish inflexible standards the court in its opinion did discuss some factors applicable to the circumstances of that case some of which are appropriately considered in the case at bar. These factors related to the existence or non-existence of compelling or substantial governmental interest affecting the purposes of the governmental agency or its relation with its employees.

As I analyze the briefs of the parties and the opinion of the majority it seems to me that a claim is made that the requirement is justified because of a governmental interest in determining and specifying a uniform and because of a governmental interest in promoting patriotism, loyalty and allegiance. There is no doubt that a police department or the commanding officer does have an interest in determining the uniform to be worn by the police officers. However I do not believe or understand the simile between the color of a uniform and the display of a flag patch. I do not regard the display of the flag patch as a meaningless equivalent of whether a uniform should be blue, whether it should have brass buttons or whether the shirt should be light or dark. By the same logic assuming that an emblem was meaningless or that its meaning could be ignored merely because part of a uniform, it would follow that such symbols as a peace symbol or the United Nations flag could be a required display. The flag patch was not intended merely as an ornament or decoration but was intended to convey meaning and beliefs. Thus the wearer is in effect required to speak or make a particular statement. The

nature of the flag patch itself as well as the circumstances described above indicating the origin of the requirement dispel any indication that the flag patch was or was intended to be just a part of the uniform. Nor can it be said that the issue is of so little consequence or significance as not to justify constitutional protection. If the matter is of such small significance it should also follow that compulsion, suspension and discharge would be inappropriate penalties.

Nor do I see any special interest of the police department in promoting patriotism, loyalty or allegiance to any agency other than the police department. They are not functions of special concern to police departments as distinguished from other institutions, agencies or individuals affecting the citizens generally. Indeed *West Virginia State Board of Education v. Barnette* (1943), 319 U.S. 624, 87 L.Ed. 1628, 63 S.Ct. 1178, well recognizing the desirability of such virtues, leaves no doubt that particular manners of observance may not be compelled.

The loyalty oath cases (*Garner v. Board of Public Works,* 341 U.S. 716, 95 L.Ed. 1317, 71 S.Ct. 733; *Law Students Civil Rights Research Council, Inc. v. Wadmond* (1971), 401 U.S. 154, 27 L.Ed.2d 749, 91 S.Ct. 720; *Baird v. State Bar of Arizona* (1971), 401 U.S. 1, 27 L.Ed.2d 639, 91 S.Ct. 792, and *In re Stolar*, 401 U.S. 23, 27 L.Ed.2d 657, 91 S.Ct. 713), I believe lend additional support to the principle that compulsory commitment to the political views and beliefs generally associated with ideas of patriotism and loyalty is constitutionally impermissible. While the cases may not be completely reconcilable in their application to particular factual situations they generally support the proposition that a governmental employee may be required to affirm his support of the principles of the Constitution of the United States and the constitutions of the several states. Conceding that the government has an interest in having employees not bent on destroying the government by force or violence the cases are in harmony that disclosure may not be required of political beliefs, attitudes or views the same being irrelevant to the legitimate interest which the government is seeking to protect.

The majority opinion relies primarily on three cases. The first *Parker v. Morgan* (1971), 322 F.Supp. 585, involves two criminal prosecutions under a flag statute of the state of North Carolina which statute was held unconstitutional by the court. Since the case at bar does not involve either the validity or application of a flag statute its observations regarding flags, their display or their destruction are of general interest but the precise holding that the definition of a flag was impermissibly vague is of no particular application to the case at bar. However the court affirms that "No man can be punished for refusal to affirmatively demonstrate respect for the flag, nor can anyone be punished for speaking con-

temptuously of the flag, whether by word or gesture", basing such declaration on *West Virginia State Board of Education v. Barnette* (1943), 319 U.S. 624, 87 L.Ed. 1628, 63 S.Ct. 1178, and *Street v. New York,* 394 U.S. 576 22 L.Ed.2d 572, 89 S.Ct. 1354.

The other two cases cited by the majority opinion, *U.S. v. O'Brien* (1968), 391 U.S. 367, 20 L.Ed.2d 672, 88 S.Ct. 1673 and *Sutherland v. DeWulf,* 323 F.Supp. 740, involve respectively, prosecutions for the burning of a draft registration card and a United States flag. Each of the cases involves the application of a criminal statute to citizens generally and finds the statutes both constitutional on their face and in their application over the objection that first amendment rights are violated. The force of the reasoning in the *O'Brien* and *Sutherland* cases persuades me that a statute either state or federal requiring that all citizens wear flag patches or some other flag emblem on penalty of criminal sanctions would be violative of first amendment rights. Such a conclusion has I believe an important consequence so far as the issues in this case are concerned. If the display of the flag may not be required of citizens generally it would be an equally impermissible requirement of public employees unless as I have discussed earlier there was something unique in the nature of the public employment, justifying restriction of first amendment liberties. As so viewed I believe the *O'Brien* and *Sutherland* cases support the view which I am taking rather than that of the majority.

As in *Pickering v. Board of Education* (1968), 391 U.S. 563, 20 L.Ed.2d 811, 88 S.Ct. 1731, I conclude under the circumstances of this case the interest of the police department administration in limiting police officers' expression of belief and opinion is not significantly greater than the interest of the public generally to be free of such limitation. Accordingly I would reverse the order of the Circuit Court confirming the Board's decision.