[Civ. No. 43117. First Dist., Div. One. Oct. 2, 1978.]

CBS, INC., Petitioner v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
DAVID E. POLLARD et al., Real Parties in Interest.

242

**COUNSEL**

John B. Purcell, Robert A. Mackey, Herbert M. Schoenberg, O'Melveny & Meyers, William W. Vaughn, Raymond P. Hermann, Dean M. Weiner, B. Boyd Hight and John W. Stamper for Petitioner.

Jonathan Kotler as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Sheldon Portman, Public Defender, John L. Williams, Jr., Deputy Public Defender, and Joseph A. Mecia for Real Parties in Interest.

**OPINION**

**NEWSOM, J.**—Petitioner CBS seeks a writ of prohibition commanding the respondent Superior Court of Santa Clara County to set aside its

order denying petitioner's motion to quash the real parties in interests' subpoena duces tecum for media materials, and to grant the motion.

The procedural background of the case is essentially as follows.

Real parties in interest, David Pollard and John Blackwell (hereinafter defendants), are charged with selling a controlled substance, PCP, commonly known as "Angel Dust," in violation of Health and Safety Code section 11379.

They caused a subpoena duces tecum to be issued and served on petitioner's custodian of records to discover certain video tapes, tape recordings and motion pictures of three meetings between the defendants and narcotics officers of the Santa Clara Sheriff's Department on August 12, 1977, between 8 p.m. and 9:15 p.m. These materials had been compiled by CBS pursuant to an agreement with the department to broadcast, as part of the October 23, 1977, "Sixty Minutes" program, a segment regarding the dangers and increase in the use of "Angel Dust."

As part of the contract the department also agreed to equip two undercover agents with microphones, so that conversations could be tape recorded and played with the film. CBS agreed that no film revealing the identities of any undercover agents would be shown unless the officers' undercover role had ended.

The specific materials requested by defendants in the trial court were these recordings and films of meetings between undercover agents and defendants at the Santa Clara County Fairgrounds, which included, defendants claim, negotiations for the sale of "Angel Dust."

CBS moved to quash the subpoena on grounds that no showing of good cause had been made; that Evidence Code section 1070 made the subpoena unenforceable; and that its enforcement would violate CBS's First Amendment rights under the United States Constitution, as well as its rights under article I, section 2, of the California Constitution.

After a hearing,[1] on December 12, 1977, respondent court denied petitioner's motion, holding that defendants had made the requisite

[1]The court, confronted with petitioner's motion to quash defendant's subpoena duces tecum issued October 24, 1977, treated the hearing as a motion by defendants for issuance of a subpoena duces tecum, and granted, over objection, a request to offer evidence into

showing of good cause, and that, in weighing defendants' right to a fair trial against CBS's rights under the relevant statutory and constitutional provisions, the interests of defendants should prevail.

Accordingly, on December 21, 1977, the court issued its order denying CBS's motion and ordering that CBS deliver to defendants "any and all video and audio tapes, photographs, transcriptions of any tapes, outtakes or any other films of the three meetings between officers of the Santa Clara County Narcotics Bureau and defendants herein which took place between 8:15 and 9:00 p.m. on the evening of August 12, 1977, at the Santa Clara County Fairgrounds, San Jose, California."

The instant petition was thereafter filed on January 16, 1978. On the same date this court issued a stay of the enforcement of the subpoena duces tecum, and on May 31, 1978, issued the alternative writ.

While no challenge has been asserted to our jurisdiction, we think it appropriate to briefly comment on the propriety of our reviewing the issues presented by the writ.

■ The prerogative writ has long been recognized as a proper method for review of interlocutory orders where questions of a grave nature and of significant legal impact requiring immediate resolution are presented. (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]; *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330 [107 Cal.Rptr. 309, 508 P.2d 309]; see generally 5 Witkin Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 89, pp. 3865-3866.) We believe that the issues presented by the instant petition fall within this ambit of review —notwithstanding that no contempt proceeding has been consummated or is imminently threatened—since fundamental questions respecting freedom of the press are asserted.

Moreover, the granting of the alternative writ itself imports the determination that no other adequate remedy is available to petitioner. (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149 [118 Cal.Rptr. 14, 529 P.2d 46]; *Babb* v. *Superior Court, supra,* p. 851.) We accordingly turn to the merits of the petition.

---

the record consisting of the preliminary transcript, a videotape from "Sixty Minutes" depicting the events at the fairground on the evening of the arrests and the testimony of the three officers involved in the arrest.

*Factual Background*

On the evening of August 12, 1977, undercover agents of the Santa Clara County Narcotics Bureau proceeded, pursuant to agreement with CBS, to the county fairgrounds, where they expected to film and record sales of "Angel Dust" for showing on the "Sixty Minutes" program. The actual terms of the cooperative agreement between the bureau and CBS, while not incorporated in any formal written agreement, may be gleaned from the testimony at the hearing below. Essentially, it provided that CBS would provide all technical assistance, and, in exchange for the right to film, would protect the identity of the undercover officers.

Of the officers present at the fairgrounds, only three had actual contact with defendants, Officers Keech, Weber and Davis. Only Keech was equipped with a body transmitter, which was connected to a nearby "receiver van" furnished by the bureau and manned by both CBS and bureau personnel.

The three officers testified at the hearing on the motions to quash subpoena that they could not remember the exact words exchanged between them severally and the individual defendants, nor the sequence in which such words were spoken. All three testified, further, that their recollections would be refreshed by seeing and hearing the tapes.

In these circumstances, defendants argue that the production of both video and audio portions of the "outtakes" is crucial to their defense. Defendant Blackwell contends further that, since his liability allegedly derives from that of codefendant Pollard, on a conspiracy or an aiding and abetting theory, the exact words and the sequence thereof are crucial not only to his general defense but to his ability to prove entrapment.

CBS's resistance to production of the subject materials was based upon the statutory and constitutional grounds stated above.

## I

A motion for discovery by the accused is addressed to the sound discretion of the trial court, which has inherent power to order discovery in the interests of justice. (*Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 816 [112 Cal.Rptr. 257, 518 P.2d 1353]; *People* v. *Terry* (1962) 57 Cal.2d 538, 560 [21 Cal.Rptr. 185, 370 P.2d 985].) On the motion to quash, the burden shifts to the moving party to show an *abuse* of the trial court's discretion.

(*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305].)

In considering whether any such abuse occurred, we shall first turn to petitioner's contention that the materials respondents seek fall directly within the allegedly absolute protection of unpublished materials set forth in Evidence Code section 1070, subdivision (c). This section reads in its entirety as follows:

"(a) A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"(b) Nor can a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"(c) As used in this section, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."

■ We must initially determine whether section 1070 applies on the facts before us, which involve both unpublished video and audio tapes presently in the possession of CBS.

Petitioner argues that, since the outtakes are unpublished, section 1070 expressly applies. The fact of their being unpublished, however, strikes us as not in itself significant where, as here, the claimant of the privilege fails to explain what of substance in the materials sought to be produced has not already been revealed.

We note in this respect that while Officers Davis and Weber expected to continue in undercover roles, Officer Keech testified that his assignment was soon to change, so that he had less interest than his associates in preserving some measure of anonymity. Indeed, Keech conceded that he was agreeable to having full-face photographs of himself shown on national television if the program were to be aired. The crucial factor in our analysis, however, is that all three officers, when called as witnesses at the motion hearing, revealed their identities and roles. Thus, the underlying purpose of the agreed confidentiality was lost.

Since this information is now a matter of public record, it is difficult to see how the production of tapes which will merely confirm—or at worst very slightly amplify—what has already been revealed, will materially erode the vicarious interest in confidentiality asserted by CBS.

For these reasons we are convinced that the provisions of Evidence Code section 1070 do not apply to the facts of this case.

## II

Petitioner's second argument is that the trial court's order violates its rights under the First Amendment of the United States Constitution, as well as article I, section 2, of the California Constitution.

The order in question reads in pertinent part as follows: "Good cause having been shown before this Court, it is hereby ORDERED, ADJUDGED AND DECREED, that C.B.S. News, Inc., deliver to the attorneys or lawfully designated agents thereof any and all video and audio tapes, photographs, transcriptions of any tapes, outtakes, or any other films of the three meetings between officers of the Santa Clara County Narcotics Bureau and defendants herein, which took place between 8:15 and 9:00 p.m., on the evening of August 12, 1977, at the Santa Clara County Fairgrounds, San Jose, California. . . ."

More specifically, CBS contends that the order impinges on all three generally protected and recognized press functions because (1) it intrudes

on the ability to acquire information by precluding the press from giving assurances of confidentiality; (2) interferes with the ability to process information, because reporters will be required to decide what to record in the light of possible later production of such materials; and (3) limits the ability to disseminate information because the news editor will lose his right to decide what will be disseminated.

Initially, we think the order interferes, if with any right, only with the constitutionally protected right of "news gathering."[2] The claims made by CBS in this respect are similar to those considered by the United States Supreme Court in *Branzburg* v. *Hayes, supra,* 408 U.S. 665. There the court characterized petitioner's First Amendment claims as: "That to gather news it is often necessary to agree either not to identify the source of information published or to publish only part of the facts revealed, or both; . . . if the reporter is nevertheless forced to reveal these confidences to a grand jury, the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment." (408 U.S. at pp. 679-680 [33 L.Ed.2d at p. 638].) The news gathering interest has been recognized in other recent cases. (Cf. *Zurcher* v. *Stanford Daily* (1978) 436 U.S. 547 [56 L.Ed.2d 525, 98 S.Ct. 1970]; *Pell* v. *Procunier* (1973) 417 U.S. 817 [41 L.Ed.2d 495, 94 S.Ct. 2800].)

Against this right we are obliged to measure the threat to defendants' right to a fair trial. The existence of such a right is clear. It rests, essentially, on Sixth Amendment guarantees and, in California law, it has resulted in the rule that, where a criminal defendant has demonstrated a *reasonable possibility* that evidence sought to be discovered might result in his exoneration, he is entitled to its discovery. (*People* v. *Borunda* (1974) 11 Cal.3d 523 [113 Cal.Rptr. 825, 522 P.2d 1];

---

[2]CBS's claims of interference with the "processing" and disseminating of information are not raised by the facts of its case. "Processing," which refers to the editorial process (although petitioner erroneously seems to argue that interference with the editorial process would violate its right to disseminate information) would not be interfered with by a court's order to reveal a newsperson's sources. (See *Branzburg* v. *Hayes* (1971) 408 U.S. 665, 681-682 [33 L.Ed.2d 626, 639-640, 92 S.Ct. 2646].) Similarly such a court order would not interfere with CBS's right to disseminate news either. (*Id.*) Because the above issues are not presented by the facts of this case it is not proper to deal with them here. A constitutional issue may not be decided on speculation or hypothesis not shown to affect the parties before the court. (*In re Johnson* (1965) 62 Cal.2d 325, 332 [42 Cal.Rptr. 228, 398 P.2d 420]; *In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)

"Processing" as defined by petitioner falls under the category of "news gathering" and is discussed *infra.*

*Honore* v. *Superior Court* (1969) 70 Cal.2d 162 [74 Cal.Rptr. 233, 449 P.2d 169].)

■  Where the rights of the press and defendants conflict, neither are entitled per se to precedence. The United States Supreme Court has in fact expressly rejected the task of assigning priorities between them. (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 570 [49 L.Ed.2d 683, 704, 96 S.Ct. 2791]; *Near* v. *Minnesota* ex rel. *Olson* (1931) 283 U.S. 697, 708 [75 L.Ed. 1357, 1363-1364, 51 S.Ct. 625].) Instead, we must balance the interests involved, and consider, on the precise facts before us, whether and in what manner a reconciliation of competing interests may be accomplished with minimum interference with the rights of the parties.

When we measure the interests of defendants—especially that of Blackwell, against the tenuous restraint on CBS's right to gather information which affirmance of the trial court's order would entail, the necessity of permitting discovery becomes clear. Not to do so would directly impair defendants' rights to a fair trial.  ■  As was said in the United States Supreme Court case of *Estes* v. *Texas* (1965) 381 U.S. 532, 539 [14 L.Ed.2d 543, 548, 85 S.Ct. 1628], "The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences, including court proceedings. *While maximum freedom must be allowed the press in carrying on this important function in a democratic society its exercise must necessarily be subject to the maintenance of absolute fairness in the judicial process.*" (Italics added.)

Where we can without violence to defendants' rights promote the interests of a free press we will do so. But the balancing process here shows, we think, that a partial affirmance of the trial court's order, with modifications as set forth below, will have no deleterious effect upon any legitimate press function, and at the same time will promote the interest of insuring a fair trial for defendants.

■  When governmental activity conflicts with First Amendment rights, the government has the burden of establishing, inter alia, that the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests. (*Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 101, fn. 8 [33 L.Ed.2d 212, 220, 92 S.Ct. 2286]; *In re Stolar* (1971) 401 U.S. 23 [27 L.Ed.2d 657, 91 S.Ct. 713];

*United States* v. *O'Brien* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673]; *DeGregory* v. *New Hamp.Atty.Gen.* (1966) 383 U.S. 825 [16 L.Ed.2d 292, 86 S.Ct. 1148].) The same principle should be applied to the instant situation where an individual's constitutional rights are determined to outweigh certain First Amendment interests of the press.[3]

■ Respondent court's order that ". . . any and all video and audio tapes, photographs, transcriptions of any tapes, outtakes, or any other films of the three meetings between officers of the Santa Clara County Narcotics Bureau and defendants herein, which took place between 8:15 and 9:00 p.m., on the evening of August 12, 1977, at the Santa Clara County Fairgrounds, San Jose, California," is impermissibly broad for the following reasons. First, respondent never viewed the requested materials to determine whether or not they contained evidence bearing on defendants' innocence or guilt. Given the competing First Amendment interests at stake, the trial court was under a duty to protect defendants' right to a fair trial with the least possible interference with CBS's First Amendment rights, which would require at a minimum, examining *in camera* the subpoenaed CBS materials. Second, since defendants raise no question as to whether or not they were present at the dealings and sale, but only seek the precise words spoken and sequence of statements made, discovery of the voice tapes of all meetings between defendants and the narcotics officers may be sufficient. If discovery were so limited, the agreement between CBS and the Santa Clara Narcotics Bureau might be essentially preserved in that, according to CBS "it was agreed that no film would be utilized for any purpose which depicted the faces of any agent except one who was about to be reassigned and would no longer be conducting undercover investigations." Third, if after inspection by the trial court, all the materials are deemed necessary to real parties' defense, the faces of exposed undercover officers can be blocked out without lessening the efficacy of the materials.

[3]Some support for this position can be found in the language of *Nebraska Press Assn.* v. *Stuart, supra,* 427 U.S. 539, 562-563 [49 L.Ed.2d 683, 699-700], wherein the court held it must determine, inter alia, whether other measures short of an order restraining all publication would have insured the defendant a fair trial. A factor in the court's ruling, that the prior restraints imposed to protect the accused were unconstitutional, was its finding that "we cannot say on this record that alternatives to a prior restraint on petitioners would not have sufficiently mitigated the adverse effects of pretrial publicity so as to make prior restraint unnecessary." (*Nebraska Press Assn.* v. *Stuart, supra,* 427 U.S. at p. 569 [49 L.Ed.2d at p. 703].) Additional support is found in *Zurcher* v. *Stanford Daily* where the court stated, "Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.' " (436 U.S. at p. 564 [56 L.Ed.2d at p. 541].)

Accordingly, the peremptory writ is denied, the alternative writ is discharged, and the matter is remanded with instructions that the court reconsider the scope of its order, having in mind that the legitimate needs of law enforcement and CBS's claimed pledge of secrecy might both be preserved if the discovery order were narrowed by appropriate editing of the video tapes in question.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied October 30, 1978.