**UNITED STATES v. GORDON KIYOSHI HIRABAYASHI.**

No. 45738.

District Court, W. D. Washington, N. D.
Sept. 15, 1942.

J. Charles Dennis, U. S. Atty., and G. D. Hile and Allan Pomeroy, Asst. U. S. Attys., all of Seattle, Wash., for plaintiff.

Frank L. Walters, of Seattle, Wash., for defendant.

BLACK, District Judge.

The indictment involved in this action in Count I charges the defendant, a person of Japanese ancestry residing at Seattle in Military Area No. 1, with violating Civilian Exclusion Order No. 57 by failing to report to the Civilian Control Station, and in Count II charges said defendant with violating the curfew provision of Public Proclamation No. 3 issued by the Military Commander of the Western Defense Command. Upon arraignment, the defendant pleaded not guilty to each count and was given the privilege of interposing motion or demurrer to the indictment within ten days.

The defendant, after filing an original demurrer, later, pursuant to court permission, interposed an amended demurrer to each such count of the indictment upon the grounds that the orders and proclamations involved are unconstitutional by virtue of being in violation of the Fifth Amendment and of Article 4, Section 2, Clause 1, of the Constitution of the United States, and also are not authorized by Executive Order of the President or by any valid legislative act or law of Congress.

The defendant at the time of filing such amended demurrer, without any permission, filed a plea in abatement alleging that the defendant is a natural born citizen of this country, aged twenty-four, bearing true faith and allegiance to the United States and none to Japan. The defendant two weeks prior to the filing of said plea in abatement asked for and was granted permission to file a motion to make the indictment more definite and certain. No such motion was ever filed nor has the defendant at any time even to this date requested permission to interpose such or any plea in abatement.

The government has moved to strike such plea and has also demurred to same.

The matter was presented to the court after oral argument supplementing very extensive briefs which in the aggregate cited about one hundred thirty court decisions

and several texts. It is obvious that no analysis of such a mass of citations can be here indulged in without most tediously extending this opinion.

In substance and effect the defendant's position is that regardless of how critical the war perils, of how necessary and vital the military area, and of how essential to American success in this conflict the curfew provisions and evacuation orders applicable to those of Japanese ancestry in such military area, may be that the armed forces of this country and our government are absolutely helpless to make or enforce any such curfew provisions or exclusion orders until a Constitutional amendment has been proposed, voted by both houses of Congress, and finally adopted by three-fourths of the states.

It must not for an instant be forgotten that since Pearl Harbor last December we have been engaged in a total war with enemies unbelievably treacherous and wholly ruthless, who intend to totally destroy this nation, its Constitution, our way of life, and trample all liberty and freedom everywhere from this earth. It must be realized that civilization itself is at stake in this global conflict.

After grave and careful consideration of the arguments and authorities presented and of the extremely important phases of this question, I am satisfied that Executive Order 9066, Public Law 503, Act March 21, 1942, 18 U.S.C.A. § 97a, the curfew regulation and Exclusion Order 57 are constitutional and valid, that the indictment is sufficient and that the attack the defendant has made against it must fail.

■ The attempted plea in abatement should be stricken. It was tardily interposed without permission. To permit it to stand would be a mistake by virtue of the precedent. However, the striking of it will not at all decrease or affect any rights of defendant.

The indictment in merely charging the defendant with being of Japanese ancestry permits the implication that he was born in the United States and is therefore a citizen. At the trial, defendant will, of course, be permitted to introduce evidence to such effect if he so desires.

At the close of the oral argument counsel were advised that my views as expressed in Ex parte Ventura, et al., D.C., 44 F.Supp. 520, were quite at variance with the defense arguments in this case and that unless I came to the conclusion that I was then mistaken that of necessity my decision would be adverse to defendant's contentions now before me. It suffices to say that I am still of the opinion that my views as contained in that decision are correct.

■ It was recently stated in State of California v. Anglim, 9 Cir., 129 F.2d 455, 460: " * * * The same act at one time may be regarded as constitutional by facts judicially noted or other facts then shown, and at another time, on other known or proved facts, be held unconstitutional. It was so held in an opinion by Mr. Justice Holmes in Chastleton Corp. v. Sinclair, 264 U.S. 543, 548, 549, 44 S.Ct. 405, 68 L.Ed. 841, in determining the constitutionality of the rent regulating law for the District of Columbia."

■ And so the decision of this case must be in the light of the unprecedented world conflict which so suddenly engulfed this nation, in the light of this being a declared Military Area, in the light of the dangers that would confront us if defendant should prevail, in the light of the advantage to this nation and actually to those of Japanese ancestry from the orders and proclamations which defendant attacks.

This Pacific Coast has been shelled at Santa Barbara, Seaside, Vancouver Island, ships have been submarined without warning in sight of shore, sinking has occurred near the entrance to the straits that lead to Puget Sound, Dutch Harbor has been bombed, and a formidable force of Japanese soldiers occupies Kiska Island. Who can guarantee that they who have already invaded the western Aleutians have not since Pearl Harbor been perfecting plans to attack by carrier planes and suicide parachutists the vital Seattle bomber factories, our docks so essential to Alaska's life, the navy yard at Bremerton just across the bay?

The Commander in Chief of our Army and our Navy, the President, in exercise of the war authorities granted him by the Constitution and by certain legislation, on February 19, 1942, issued Executive Order 9066. Said Executive Order provides that the Secretary of War and Military Commanders designated by him were authorized and directed, whenever, they deemed such action necessary " * * * to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to

which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion * * *."

On February 20, 1942, the Secretary of War designated Lieutenant General DeWitt to carry out the duties and responsibilities imposed by said Executive Order for that portion of the United States embraced in the Western Defense Command, which includes Alaska, Washington, Oregon, California and five other states.

On March 2, 1942, in said Public Proclamation No. 1 General DeWitt declared that the entire Pacific Coast was by its geographical location " * * * particularly subject to attack, to attempted invasion by the armed forces of nations with which the United States is now at war, and, in connection therewith, is subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations :"

On March 21, 1942, Public Law No. 503 enacted by Congress became effective. It reads, in part: " * * * whoever shall * * * leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive Order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor * * *."

In Public Proclamation No. 3, issued March 24, 1942, as aforesaid, it is stated that: "The present situation within these Military Areas (including Military Area No. 1) and Zones requires as a matter of military necessity the establishment of certain regulations pertaining to all enemy aliens and all persons of Japanese ancestry within said Military Areas and Zones thereof."

Civilian Exclusion Order No. 57, issued May 10, 1942, provided that after Saturday noon, May 16, 1942, "all persons of Japanese ancestry, both alien and non-alien, be excluded from that portion of Military Area No. 1," consisting of that portion of Seattle in which the indictment alleged defendant resided, and further required that persons of Japanese ancestry personally or by representative as therein specified should report to the therein specified Civil Control Station on May 11 or May 12, 1942. Such Civilian Exclusion Order No. 57 then gave instructions relative to the regulations for evacuation to the Assembly Center.

In the very recent opinion under date of July 29, 1942, of United States District Judge F. Ryan Duffy in the Lincoln Seiichi Kanai habeas corpus proceeding before him, in which such petitioner, an American citizen of Japanese ancestry, challenged the constitutionality of said Presidential Order No. 9066 and attacked the validity of the same Military Area No. 1 herein involved, the court said [Ex parte Lincoln Seiichi Kanai, D.C., 46 F.Supp. 286]:

" * * * This court will not constitute itself as a board of strategy, and declare what is a necessary or proper military area.

" * * * The field of military operation is not confined to the scene of actual physical combat. Our cities and transportation systems, our coastline, our harbors, and even our agricultural areas are all vitally important in the all-out war effort in which our country must engage if our form of government is to survive. * * * The theater of war is no longer limited to any definite geographical area. Saboteurs have already landed on our coasts. This court can take judicial notice of the extensive manufacturing facilities for airplanes and other munitions of war which are located on or near our west coast.

"Rights of the individual, under our federal Constitution and its amendments, are not absolute. When such rights come into conflict with other rights granted for the protection and safety and general welfare of the public, they must at times give way. * * * In re Schroeder Hotel Co., 7 Cir., 86 F.2d 491; Hitchman Coal & Coke Co. v. Mitchell et al., 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918 B, 461. * * *

"That there is nothing about the executive order or the designation of the military areas, which is unconstitutional, is very certain, considering the necessities and the exigencies of war which has already struck upon our Pacific coast."

The curfew provision and Civilian Exclusion Order No. 57 here involved are very definite and understandable. There is no good reason why defendant should not easi-

ly have comprehended what they required of him. It clearly appears that they are not only reasonable but vitally necessary.

The value to this country of such war measures seems most apparent. On even casual analysis their advantage to all those American citizens of Japanese ancestry who are loyal to this country also quickly appears.

Of vital importance in considering this question is the fact that the parachutists and saboteurs, as well as the soldiers, of Japan make diabolically clever use of infiltration tactics. They are shrewd masters of tricky concealment among any who resemble them. With the aid of any artifice or treachery they seek such human camouflage and with uncanny skill discover and take advantage of any disloyalty among their kind.

The preamble to our Federal Constitution says: "We, the people of the United States, in Order to  *  *  *  provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America."

The President as Commander in Chief, and the Military Commander in this Area have determined that the curfew, reporting and evacuation provisions applicable to persons of Japanese ancestry in certain vital military areas, are essential. It may well be assumed that Congress enacted Public Law No. 503 to authorize such determination "in Order to  *  *  *  provide for the common defence  *  *  *  and secure the Blessings of Liberty to ourselves and our Posterity."

While emergency cannot create power, it can call into play a power already existing but only exercised in times of emergency. Wilson v. New et al., 243 U.S. 332, 348, 37 S.Ct. 298, 61 L.Ed. 755, L.R.A.1917E, 938, Ann.Cas.1918A, 1024; Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 425, 426, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481. War powers are to be construed broadly. See Hamilton v. Kentucky Distilleries & Warehouse Co. 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194. It has been well said that "the power to wage war is the power to wage war successfully."

The defendant may most properly be deemed by the President, military forces and Congress as residing in a portion of a vital military fortress and factory arsenal. Ex parte Ventura, supra.

In view of the war emergency the President and the Commander of this defense command, as authorized by Congress in said Public Law 503, may determine whether persons of Japanese ancestry shall observe curfew in a military area and whether they shall be removed therefrom.

The contentions that the Fourth, Fifth and Sixth Amendments or Article 4, Section 2, Clause 1 of the Constitution defeat the indictment has not been overlooked. Defendant has submitted his technical interpretations of such provisions.

As has already been pointed out, certainly in time of war a technical right of an individual should not be permitted to endanger all of the constitutional rights of the whole citizenry.

Article 4, Section 2, Clause 1 reads as follows: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Obviously such provision is not applicable to this case in these times under the circumstances now existing. The powers challenged by this defendant are being exercised not by any state but by the Federal Government.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In my opinion the indictment against defendant is not affected by such amendment.

The defendant, recognizing that the Fourteenth Amendment applies only to action by the states, has resorted to the Fifth Amendment. "But the Fifth Amendment, unlike the Fourteenth, has no equal protection clause." Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 401, 60 S.Ct. 907, 916, 84 L.Ed. 1263.

Defendant in such connection contends that the curfew regulations and exclusion order applicable to him are discriminatory. Such contention must be considered in the light of the war emergency. The validity of conscription which applies only to certain ages of one sex and excepts certain

classes of persons from military service has been judicially determined as not invalid on the ground of being discriminatory. Moreover, the Social Security Act, 42 U.S.C.A. § 301 et seq., has successfully hurdled the objection that it was in violation of the Fifth Amendment in that it was discriminatory because it did not apply to certain employers or certain occupations. Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293.

With respect to the application of the Fifth and Sixth Amendments in time of war Charles E. Hughes, in 1917, discussing "War Powers Under the Constitution", 42 American Bar Association Reports, 237, 243, stated: "Clearly, these amendments, normally and perfectly adapted to conditions of peace, do not have the same complete and universal application in time of war."

Certainly a reading of the Sixth Amendment does not disclose any sufficient basis therein during the present emergency to defeat the indictment.

The holding of Ex parte Milligan, 4 Wall. 2, 18 L.Ed. 281, is not applicable here. This prosecution is being maintained in this court of law—in that case the defendant was tried before a military commission although the courts were then open and functioning. There are many other differences, as a reading of such will disclose, some of which are mentioned in Ex parte Ventura et al., supra.

Dimouts, blackouts, air raid sirens, barrage balloons, are some of the many unprecedented precautionary measures deemed by the military to be necessary in this area. No one can reasonably question the wisdom of such measures. And this court will not question in this time of war the wisdom or necessity of the curfew or evacuation orders with respect to those of Japanese ancestry which are involved in this proceeding. The situation is too grave —the menace too great. Nor can defendant substitute his judgment for the judgment of the Commander in Chief and the general acting under the President's direction, pursuant to constitutional powers and the Congressional ratification and authority of Public Law 503.

The Constitution of the United States was intended by the fathers who framed it to be able to cope with war emergencies. This nation came into being as a result of a successful war. The Constitution was written shortly thereafter and at a time when its framers had every reason, by virtue of their experience and in the light of then world conditions, to expect this nation would be confronted by wars in future.

In Home Building & Loan Association v. Blaisdell, supra, in the court's opinion by Chief Justice Hughes, at page 426 of 290 U.S., at page 235 of 54 S.Ct., 78 L.Ed. 413, 88 A.L.R. 1481, it is said: "While emergency does not create power, emergency may furnish the occasion for the exercise of power. * * * The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. Thus, the war power of the federal government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties. When the provisions of the Constitution, in grant or restriction, are specific, so particularized as not to admit of construction, no question is presented. Thus, emergency would not permit a state to have more than two Senators in the Congress, * * *. But, where constitutional grants and limitations of power are set forth in general clauses, which afford a broad outline, the process of construction is essential to fill in the details."

Unquestionably, the constitutional grants and limitations of power applicable to the question here involved are set forth in general clauses. Therefore, our Constitution does permit Congress and our President, as Commander in Chief in time of war, to make and enforce necessary regulations to protect critical military areas desperately essential for national defense. In these days of lightning war this country does not have to submit to destruction while it awaits the slow process of Constitutional amendment.

There must, of course, be extraordinary reasons to justify curfew for or any removal, even from a military area, of American citizens residing therein. But with respect to those of Japanese ancestry in Military Area No. 1 certainly since Pearl Harbor most extraordinary reasons have obtained.

Written orders in harmony with this decision striking defendant's plea in abatement and overruling defendant's amended demurrer to each count of the indictment is requested.