**In the Matter of Melvin BELLI.**

**Civ. A. No. 575–71.**

United States District Court,
District of Columbia.

Feb. 6, 1974.

As Amended Feb. 13, 1974.

Melvin Belli, pro se.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on the motion of Melvin Belli to be admitted to the bar of this Court pro hac vice. A brief outline of the history and development of this suit is necessary to place this motion in its proper perspective.

The complaint [1] in this malpractice action was filed on March 18, 1971, and alleged that plaintiff, Charlene Morris, a minor, became blind due to the negligence of the defendants. After random assignment of the case to Judge John Lewis Smith, Jr., of this Court, Mr. Belli was admitted pro hac vice by the Court.[2] Following a fairly lengthy trial,[3] the jury returned a substantial verdict for the plaintiff.[4] Defendants moved for a new trial and Judge Smith, by Order of April 18, 1973, granted this motion. The basis of Judge Smith's decision, upon his review of the transcript, was that the deliberate mention of insurance by Mr. Belli on several occasions was so prejudicial and detrimental to defendant Children's Hospital that a new trial was necessary. Thereafter, plaintiff filed a motion seeking to have Judge Smith recuse himself under 28 U.S.C. § 144, which was granted. Subsequently, the case was reassigned to this member of the Court.

On May 14, 1973, Mr. Belli appeared on a nationwide T.V. show, during which he made certain derogatory remarks[5] concerning Judge Smith and this District Court that raise grave doubts whether Mr. Belli should again be admitted pro hac vice in this jurisdiction. The test as to whether a nonresident lawyer should be admitted pro hac vice is stated succinctly in an opinion of the Fourth Circuit in Thomas v. Cassidy, 249 F.2d 91 (1957), cert. denied, Fitzgerald v. Cassidy, 355 U.S. 958, 788 S.Ct. 544, 2 L.Ed.2d 533 (1958). In that decision the Court noted:

> It is well settled that permission to a nonresident attorney, who has not been admitted to practice in a court, to appear pro hac vice in a case there pending is not a right but a privilege, the granting of which is a matter of grace resting in the sound discretion of the presiding judge. 5 Am.Jur. p. 572; Manning v. Roanoke & T. R. Co., 122 N.C. 824, 28 S.E. 963; Youmans v. Hanna, 35 N.D. 479, 160 N.W. 705, 161 N.W. 797, Ann.Cas.1917E, 263; Note 24 L.R.A.,N.S., 754.

249 F.2d at 92. *See also* Atchison, Topeka and Santa Fe Railway Co. v. Jackson, 235 F.2d 390, 393 (10th Cir. 1956).

The court in *Thomas* found that the "unlawyerlike conduct" (249 F.2d at 92) of plaintiff's counsel in the same case in which he wished to then appear pro hac vice, and for which the court below had denied him that privilege, was supported by the findings and was not an abuse of discretion.

This Court, in the exercise of its discretion, therefore, must determine whether the remarks and conduct of Mr. Belli were so impermissible as to warrant the denial of his motion for admission pro hac vice. For the following reasons, this Court finds that these remarks set forth fully in the margin [6]

---

1. Civil Action No. 575–71.

2. Mr. Belli is a member of the California bar but not the bar of the District of Columbia.

3. The trial began on March 6, 1973, and ended on March 23, 1973.

4. The jury deliberated for approximately two and one-half hours.

5. See Duke v. Committee on Grievances of the Supreme Court of the District of Columbia, 65 App.D.C. 284, 82 F.2d 890 (1936), in which the disbarment of counsel was af-

firmed. Counsel had made unsubstantiated remarks reflecting adversely on the integrity of the Court.

6.    *    *    *    *    *
BELLI: " . . . and I remember it was held to be in the public domain. . . . I remember the judge in that case there turned out to be a very good friend, after the case was over with, with the people on the other side. And I say that advisedly. See, I say things like that, they happen. Sometimes it doesn't . . . .

clearly warrant the denial of the motion for admission pro hac vice.

First, Mr. Belli admitted in a hearing, held *in camera* at his request, on January 31, 1974, that his statements that Judge Smith's son represented "all of the hospitals in the District" was simply inaccurate. In fact, he represents none of the hospitals and he has not lived at Judge Smith's home for several years. Additionally, Mr. Belli apologized for his remark that black jurors in this Court "couldn't sit on the same side of the courtroom ten years ago" with white jurors. Again, Mr. Belli admitted that this statement was untrue and he had simply believed this to be the case because of allegedly similar practices in the South.[7]

Finally, in regard to the statement that Judge Smith was "excused from a similar type of case just before and told not to sit," Mr. Belli to this day is not sure whether this remark is true or not. The fact is that Judge Smith voluntarily recused himself in the case to which reference was made. There is no evidence whatsoever that he was told not to sit.

Accordingly, it is the judgment of this Court that Mr. Belli's statements on nationwide television, which were calculated to prejudice the standing of this Court and to cast a shadow upon its integrity and that of one of its judges, are

---

VOICE: Did you win? Did you win that case?

BELLI: No, we lost that one. We shouldn't have lost that one. And the reason that we lost, I think, was the friendship of the judge for the defendant. Sometimes that happens. I had one in Washington, D.C. the other day, where the judge turns out to have the lawyer who represents all of the hospitals in the District, and we were suing the hospitals. It was his son and he was living with him. And this judge sitting on this case was excused from a similar type of case just before and told not to sit. And he sat on my case, and we didn't know anything about this. And there was an award in that case. To say this publicly—and I say these things publicly because they are true, and I think they should be corrected, and this thing should be corrected.

VOICE: But . . . .

BELLI: Let me just finish this one thing. Here was a little girl—it was a black girl. In Washington, the verdicts are low. We tried this before a black jury. There were 64 veniremen—people from whom you choose your jurors. Sixty-four. Sixty of them were all black. And here was a wonderful thing to see. Here in Washington, where they couldn't sit in the same side of the courtroom ten years ago—now, we're dependent upon the blacks there to give us justice, and they give good justice. They're very intelligent; they're very patient; they're wonderful jurors. They came in with an award for this little blind girl against the hospital. And they were giving this little girl dilantin. She got Stephen Johnson's Syndrome which means she got untoward effects from taking so much of dilantin. She became blind. She's 15. Beautiful tall little girl. They took her before that jury and the jury awarded $900,000. Two weeks later, this judge set it aside and said we are going to set the jury verdict aside. Some of the jurors called us just on their own motion, and they were really shocked about this, I think that judge was wrong in sitting on that case when he knew that he had been excused from similar cases against a similar defendant, and then having his son representing the Medical Association of the District of Columbia and living with him. That was not right . . . .

VOICE: Well, after you found that out, couldn't you. . . .

BELLI: We didn't know about that until after he had decided that the verdict should be set aside—the $900,000 to the little girl. Now we have made motions, and I can mention this, too, because there was a big story in the Washington Post on that just the other day. That's not right, to have a thing like that.

VOICE: No, but I was saying—if you found out about it and especially after he put it aside . . . .

BELLI: We moved to set his setting our motion for new trial aside.

GRIFFIN: Well, let me take a break. . . .

BELLI: But it's rare that those things happen. Most of our. . . . Ninety-nine and nine-tenths of our judges advisedly are not only learned but are good, and things like this don't happen . . . and when they do happen, they shock me and I think they shock all of us."

7. This member of the Court was admitted to practice in this jurisdiction more than 40 years ago. No such practice existed then or at any time within the memory of the most senior member of this Court.

without factual foundation and were recklessly made. Mr. Belli acted in complete disregard as to the factual accuracy of his statements.[8] Such conduct requires that this Court refuse to admit him to practice in this case.

Wherefore, it is by the Court this 6th day of February, 1974,

Ordered that Mr. Belli's motion for admission pro had vice be, and the same hereby is, denied.

**8.** The Code of Professional Responsibility of the American Bar Association provides direct guidance to attorneys concerning remarks in regard to the judiciary. From the annotated Code the following quotations are pertinent:

> While a lawyer as a citizen has a right to criticize [adjudicatory officials] publicly, he should be certain of the merit of his complaint, use appropriate language, and avoid petty criticisms, for unrestrained and intemperate statements tend to lessen public confidence in our legal system.

Ethical Consideration 8–6 at p. 34. The language of the Supreme Court of New Mexico in connection with a disbarment proceeding also is worthy of note. In the case of In re Meeker, 76 N.M. 354, 414 P.2d 862 (1966), the Court, in a discussion of an attorney's right to disclose corrupt or dishonest conduct in the profession, stated:

> However, this Canon [29 of the New Mexico Canons] does not permit one to make charges which are false and untrue and unfounded in fact. When one's fancy leads him to make false charges, attacking the character and integrity of others, he does so at his peril. He should not do so without adequate proof of his charges and he is certainly not authorized to make careless, untruthful and vile charges against his professional brethren.

76 N.M. at 364–365, 414 P.2d at 869, quoted at p. 34 n. 10 of the Code of Professional Responsibility.