**Giles GALAHAD, Plaintiff,**

v.

**Zita L. WEINSHIENK; John L. Kane, Jr.; Sherman G. Finesilver; Richard P. Matsch; Jim R. Carrigan; John Moore; Alfred A. Arraj; Fred M. Winner; Hatfield Chilson, individually and as Judges of the United States District Court for the District of Colorado, Defendants.**

**Civ. No. 81–BJ–1205.**

United States District Court, D. Colorado.

Jan. 17, 1983.

Giles Galahad, pro se.

Stephen Klein, Asst. U.S. Atty., Denver, Colo., for defendants.

## MEMORANDUM OPINION

JENKINS, District Judge.*

The plaintiff in this action challenges the constitutionality and the legality of the Local Rule 1(a) of the United States District Court for the District of Colorado.[1] In

---

* United States District Judge for the District of Utah, sitting by designation pursuant to 28 U.S.C. § 292(b).

1. That Rule in pertinent part reads as follows: The bar of this Court shall consist of those persons admitted to practice before it. Persons *admitted to practice in the courts of the State of Colorado* and residing or maintaining an office in Colorado, may be admitted to the bar of this Court upon motion of a member of the bar of the Court representing that the applicant is of good moral character. . . . Rule 1(a), Local Rules of Practice, United States District Court for the District of Colorado, at 1 (emphasis added).

particular, the plaintiff raises objections to the portion of Rule 1(a) that predicates membership in the bar of this Court upon admission to practice in the Colorado state courts. He seeks damages, declaratory and injunctive relief against enforcement of the Rule, arguing that as a member of the Pennsylvania state and federal bars and the Alaska bar, he is constitutionally entitled to be admitted to practice before the United States District Court for the District of Colorado.

Mr. Galahad does not challenge the residency requirement of Rule 1(a). Compare *Stalland v. South Dakota Bd. of Bar Examiners,* 530 F.Supp. 155 (D.S.D.1982). He is a Colorado resident. Rather, he asserts that unlike other Colorado residents, he should be immunized from the Colorado bar exam by virtue of his admission in other courts of other jurisdictions. He argues for a uniform policy of admission to the federal district courts as a fundamental requirement pursuant to the Due Process, Privileges and Immunities and Full Faith and Credit Clauses of the federal Constitution. Further enforcement of the requirement as against residents who are members of other courts' bars, he alleges, would amount to a violation of the federal antitrust laws as well. See 15 U.S.C. §§ 1 *et seq.* (1976 ed.). The requirement that he pass yet another state bar examination is alleged to be an unwarranted and unlawful impediment to the plaintiff's pursuit of an otherwise lawful occupation or profession. Cf. *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 111, 21 L.Ed. 394 (1873) (Bradley, J., dissenting).

## I. CLAIM FOR DAMAGES

▉ Plaintiff seeks recovery for damages amounting to 500 dollars per day from the defendants. However, he has joined only judges of the federal district court as defendants to a complaint that describes actions which are fundamentally "judicial" in nature. The federal courts exercise inherent judicial power in regulating the admission, practice and discipline of attorneys. See 28 U.S.C. §§ 1654, 2071 (1976 ed.);

Rule 83, Federal Rules of Civil Procedure; *Matter of Abrams,* 521 F.2d 1094, 1099 (3d Cir.1975), and cases cited therein. Whether postured as a challenge to the denial of admission to Galahad specifically, or as a challenge to the general validity of Local Rule 1(a) on its face, see *Doe v. Pringle,* 550 F.2d 596, 597 (10th Cir.1976), *cert. denied,* 431 U.S. 916, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977), the plaintiff's damages claim runs afoul of the doctrine of absolute judicial immunity. See generally *Martinez v. Winner,* 548 F.Supp. 278 (D.Colo.1982). The Supreme Court recently held that absolute immunity derived from the doctrine of legislative immunity applies to insulate state judges from damages liability arising from court rule-making activities. *Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 731–734, 100 S.Ct. 1967, 1974–1975, 64 L.Ed.2d 641 (1980). The court's reasoning in the *Consumers Union* case seems equally applicable to rule-making by federal judges.

At hearing, the plaintiff argued that the actions complained of are "administrative" activities not clothed with common law immunity. The *Consumers Union* case, which involved the promulgation of rules affecting the admission and conduct of attorneys, sweeps Local Rule 1(a) into the arena of immune judicial activity. Even in exercising its judgment on an individual petition, a court performs a judicial act. See *In re Summers,* 325 U.S. 561, 565, 566, 65 S.Ct. 1307, 1310, 1311, 89 L.Ed. 1795 (1945); *Doe v. Pringle,* 550 F.2d 596, 599 (10th Cir.1976). The plaintiff's argument is rendered wholly untenable.

To the extent that Galahad seeks money damages as a remedy, his claim is barred.

While the *Consumers Union* opinion closes the door to damages claims against judges arising from "judicial" or "legislative" acts, the Court expressly reserved the question of whether judicial immunity bars declaratory and injunctive relief. *Id.,* 446 U.S. at 735–736, 100 S.Ct. at 1976–1977. Galahad seeks prospective relief, to wit: admission to this Court's bar and a modification of the text of Local Rule 1(a). As-

suming, without deciding, that declaratory and injunctive relief is available as against federal district judges, see *id.,* 446 U.S. at 735 n. 13, 100 S.Ct. at 1976 n. 13, this Court must now determine whether the plaintiff has stated a claim upon any of the grounds now asserted.

## II. FULL FAITH AND CREDIT

■ Arguing that admission to the bar is a "judicial proceeding" and from the fact of his prior admission to practice before courts in Pennsylvania and Alaska, Galahad urges that his admission to practice before this Court is mandated by the following constitutional requirement:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and *Judicial Proceedings* of every other State.

U.S. Const. Art. IV, § 1 (emphasis added). While this Full Faith and Credit Clause does not in express terms bind the federal courts, it is well settled that federal courts must give full faith and credit to the judgments of state and territorial courts. See *e.g., Huron Holding Corp. v. Lincoln Mine Operating Co.,* 312 U.S. 183, 61 S.Ct. 513, 85 L.Ed. 725 (1941); *Davis v. Davis,* 305 U.S. 32, 59 S.Ct. 3, 83 L.Ed. 26 (1938).

Galahad contends that his admission to practice before Pennsylvania and Alaska courts should be translated using the device of full faith and credit into nearly automatic admission in this Court. He in essence pleads that by "judicial proceedings" he has already been admitted to the practice of law. By denying him instant admission before this Court, he argues, the defendants are denying full faith and credit to judicial proceedings in those other courts.

Congress has prescribed the manner in which full faith and credit is to be afforded to proceedings in other American jurisdictions:

> Such acts, records and judicial proceedings or copies thereof, so authenticated, shall have *the same* full faith and credit in every court within the United States and its Territories and Possessions *as they have by law or usage in the courts of such state,* Territory or Possession *from which they are taken.*

28 U.S.C. § 1738 (1976 ed.) (emphasis added).

Plaintiff has offered nothing which demonstrates that the Pennsylvania or Alaska courts would give their admissions to law practice such sweeping breadth. The U.S. District Court for the Eastern District of Pennsylvania grants admission to practice in the Eastern District of Pennsylvania. The boundaries of the district reflect the limit of that court's power. The limits of the jurisdiction are necessarily the limits of the grant. It neither assumes nor represents that it has granted anything more.

■ Pursuant to full faith and credit, this Court readily recognizes the fact of plaintiff Galahad's admission to law practice in the other jurisdictions. That fact alone may enable Galahad to appear *pro hac vice* before this Court in an appropriate case where he otherwise might not be so entitled. Cf. *Atchison, T. & S.F.R. Co. v. Jackson Railway,* 235 F.2d 390 (10th Cir. 1956); *Re Belli,* 371 F.Supp. 111 (D.Colo. 1974). This Court, however, is not bound to acknowledge that he has been admitted to the practice of law without reference to jurisdictional boundary.

> Of course, admission to the Bar of one state does not carry with it the right to practice law anywhere else. *Hawkins v. Moss,* 503 F.2d 1171 (4th Cir.1974), *cert. denied,* 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 400 (1975); . . . The same is true of admission to the district courts of the United States. See *Lark v. West,* 110 U.S.App.D.C. 157, 289 F.2d 898, *cert. denied,* 368 U.S. 865, 82 S.Ct. 114, 7 L.Ed.2d 63 (1961); . . .

*In re Rappaport,* 558 F.2d 87, 89 (2d Cir. 1977) (footnote and citations omitted); see also 7 C.J.S. Attorney & Client § 26 (1980). In prior cases in which a full faith and credit claim of this kind has been raised, it has been denied as being wholly without merit. *E.g., O'Neal v. Thompso.1,* 559 F.2d 485, 486 (9th Cir.1977). While a court may adopt a rule admitting attorneys who are

bar members in other jurisdictions as a matter of comity, see *Application of Wasserman,* 240 F.2d 213, 215 (9th Cir.1956), the Full Faith and Credit Clause has never been construed as requiring such a rule as a matter of constitutional law. See *Gaillard v. Field,* 381 F.2d 25, 28 (10th Cir.1967) ("[T]he command of the Full Faith and Circle Clause is not absolute . . .").

The plaintiff's arguments do not compel that such a construction now be reached.

### III. PRIVILEGES AND IMMUNITIES

Apart from full faith and credit, the plaintiff relies upon the Privileges and Immunities Clauses of the Federal Constitution:

> The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

U.S. Const. Art. IV, § 2.

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . .

U.S. Const.Amend. XIV, § 1. At first glance, these clauses would appear to have no bearing upon *federal* action, such as rulemaking by the federal courts. See *United States v. Gordon Kiyoshi Hirabayashi,* 46 F.Supp. 657, 661 (W.D.Wash.1942). Yet it would seem anomalous to hold that the federal government may abridge privileges and immunities of federal citizenship whereas the states may not. Federal privileges and immunities should, therefore, find protection in other constitutional language.[2]

The threshold question here, however, is whether the "right" to practice law amounts to a privilege or immunity of federal citizenship. Plaintiff argues that it does, citing cases such as *Livestock Dealers and Butchers Ass'n v. Crescent City Slaughter-House Co.,* 15 Fed.Cas. 649 (No. 8,408)

(D.C.D.La.1870); but see *The Slaughterhouse Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873).

In the first major case construing the language of Art. IV, § 2, *Corfield v. Coryell,* 6 Fed.Cas. 546 (No. 3230) (C.D.E.D. Pa.1823), Justice Washington held the privileges and immunities of *state* citizenship to encompass those rights which are fundamental, including the

> right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, *professional pursuits* or otherwise; . . .

*Id.,* 6 Fed.Cas. at 552 (emphasis added). See also *Baldwin v. Montana Fish and Game Commission,* 436 U.S. 371, 384, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1978). This right to pursue one's lawful occupation in another state is insulated against provincial discrimination by the Art. IV § 2 language. That section "establishes a norm of comity," *Austin v. New Hampshire,* 420 U.S. 656, 660, 95 S.Ct. 1191, 1194, 43 L.Ed.2d 530 (1975), "that is to prevail among the states with respect to their treatment of each other's residents." *Hicklin v. Orbeck,* 437 U.S. 518, 523–524, 98 S.Ct. 2482, 2486–2487, 57 L.Ed.2d 397 (1978). The purpose of that clause, as explained long ago in *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869) is

> "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those states are concerned . . . ."

It prevents "a state from discriminating against citizens of other states in favor of its own." *Hague v. C.I.O.,* 307 U.S. 496, 511, 59 S.Ct. 954, 962, 83 L.Ed. 1423 (1939). See also *Doe v. Bolton,* 410 U.S. 179, 200, 93 S.Ct. 739, 751, 35 L.Ed.2d 201 (1973).[3]

---

**2.** See *Twining v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908) ("Privileges and immunities of citizens of the United States, . . . are only such as arise out of the nature and essential character of the National Government, or are specifically granted or secured to all citizens by the Constitution of the United States."). It seems that the privileges and im-

munities identified in *Twining* and other cases would readily fall within the meaning of "liberty" in the Due Process Clause of the Fifth Amendment.

**3.** The language of Article IV, § 2 creates no substantive privileges or immunities. It simply requires that when a state affords rights or

Article IV, § 2 secures to citizens of other states only the privileges which citizens of the state may have and not the privileges which the citizens of the other state may have in their home state. *Hawkins v. Moss,* 503 F.2d 1171, 1179–1180 (4th Cir.1974). The plaintiff herein does not raise an Art. IV, § 2 claim; discrimination by the State of Colorado is not at issue here.[4]

Rather, the plaintiff argues that

[t]he privilege of pursuing one's vocation, and the corresponding immunity from impediments thereto, are one of the most obvious of the Privileges and Immunities that are the essence of *national citizenship.*

Memorandum at 9 (emphasis added). Mr. Galahad asks this Court to give as broad a reading to the Privileges and Immunities Clause regarding national citizenship as was given to the Article IV language in *Corfield* and subsequent cases. See *e.g., Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978); *Toomer v. Witsell,* 334 U.S. 385, 403, 68 S.Ct. 1156, 1165, 92 L.Ed. 1460 (1948); *Ward v. Maryland,* 79 U.S. (12 Wall.) 418 (1871); *Sheley v. Alaska Bar Ass'n,* 620 P.2d 640, 643 (Alas.1980). While there is now substantial scholarly support for an expansive interpretation of the Fourteenth Amendment's Privileges and Immunities Clause, see *e.g.,* R. Berger, *Government by Judiciary: The Transformation of the Fourteenth Amendment* 37–51 (1977),[5] the argument that the clause creates a substantive right to pursue one's lawful occupation or profession free from state limitations was laid to rest long ago by the United States Supreme Court. In *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), a majority of the Court expressly declined to "transfer the security and protection of all of the civil rights" which were enumerated in *Corfield v. Coryell* and other cases "from the states to the federal government," *id.,* 83 U.S. (16 Wall.) at 77, 21 L.Ed.2d 394, giving the "Privileges and Immunities" of national citizenship a narrow reading.

*The Slaughter-House Cases* affirmed the police power of the state to limit the privilege of meat cutters to pursue their chosen occupation. In a case immediately following that decision, the Court expressly held that the right to practice law in the state courts was not a privilege or immunity derived from national citizenship. *Bradwell v. The State,* 83 U.S. (16 Wall.) 130, 138–139, 21 L.Ed. 442 (1873). That view was reiterated years later by the same court. *In re Lockwood,* 154 U.S. 116, 117, 14 S.Ct. 1082, 1083, 38 L.Ed. 929 (1894).

In light of *The Slaughter-House Cases* and its progeny, it is indeed difficult to conceptualize a privilege of national citizenship that requires one's admission to practice before the federal court but is not effective as against the States pursuant to the Fourteenth Amendment. What is the source of such a substantive privilege in relation to *national* citizenship? Cases which describe "the practice of law by qualified persons" as "a 'fundamental right' triggering scrutiny under the privileges and immunities clause," *Sheley v. Alaska Bar Ass'n, supra,* 620 P.2d at 643, are speaking of *state* citizenship privileges under Article IV, § 2. See also *Stalland v. South Dakota Board of Bar Examiners,* 530 F.Supp. 155, 159 (D.S.D.1982); *Piper v. Supreme Court of New Hampshire,* 539 F.Supp. 1064 (D.N. H.1982).

---

privileges to its own citizens, it may not deny them to citizens immigrant from other states. See L. Tribe, American Constitutional Law § 6–32 (1978).

**4.** In his memorandum, Galahad makes reference to the "degenerate vicissitudes of Colorado state bar admission practices," *id.,* at 9, but does not allege any denial, for example, of his right to be subject to those practices like any other Colorado citizen.

**5.** See also T. Ely, Democracy and Distrust 28 (1980), arguing that "the most plausible interpretation of the Privileges or Immunities Clause [is] the one suggested by its language— that it was a delegation to future constitutional decisionmakers to protect certain rights that the document neither lists, at least not exhaustively, nor even in any specific way gives directions for finding."

■ While the reasoning of *The Slaughter-House Cases* has been the subject of criticism,[6] it as yet remains the law:

> The restrictive interpretation given the privileges and immunities clause in the *Slaughter-House* opinion has been consistently followed by the Court. Only once did the Court hold state legislation violative of that clause. *Colgate v. Harvey,* 296 U.S. 404, 56 S.Ct. 252, 80 L.Ed. 299 (1935). That case was overruled five years later, leaving not a single instance in over 100 years in which the privileges and immunities clause has been an effective restraint on state legislation. *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940).

W. Lockhart, Y. Kamisar & J. Choper, Constitutional Law 520 (4th ed. 1975).[7] Even if the plaintiff's action is analyzed as pleading a claim under the constitutional right to travel, see *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941); *Twining v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908) ("the right to pass freely from state to state" a privilege of national citizenship), it fails to state a claim upon which relief may be granted.

> The "privileges and immunities" provision of the Fourteenth Amendment provides no constitutional base for an attack on the Rule. The right of federal citizenship as reflected in the "right to travel" and as protected by this provision is not to be construed to mean that a citizen carries with him from state to state an absolute right of comity to practice . . . a profession, which is properly subject to state regulation, in any state to which he travels, . . .

*Hawkins v. Moss,* 503 F.2d 1171, 1178–1179 (4th Cir.1974). The plaintiff cites no authority granting him an absolute privilege to practice law, and this Court has found none.[8]

## IV. ANTI–TRUST LAW CLAIMS

Plaintiff asserts that requiring persons to pass multiple entry-level bar exams is inherently anti-competitive and violates the federal anti-trust laws. See 15 U.S.C. §§ 1 *et seq.* (1976 ed.). He disputes the effectiveness of the bar examination technique as a measure of attorney competence, arguing that this "degenerate subterfuge that multiple bar exams ensure professional competence," Memorandum at 6, diverts attention from a deliberate effort to restrict "the numerical quantity of lawyers within the State." *Id.*

In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court applied the Sherman Anti-Trust Act to invalidate a local bar association's mandatory fee schedule as unlawful anti-competitive price-fixing. In *Goldfarb,* however, the challenged rule dealt with the exchange of money for the services of already admitted attorneys.

In relation to licensing of practitioners, the Court had this to say:

> We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to estab-

---

6. See *e.g.,* R. Berger, Government by Judiciary, *supra; Twining v. New Jersey,* 211 U.S. 78, 96, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908) ("Criticism of this case has never entirely ceased, nor has it ever received universal assent by members of this court. Undoubtedly, it gave much less effect to the Fourteenth Amendment than some of the public men active in framing it intended, and disappointed many others."); McGovney, *Privileges or Immunities Clause, Fourteenth Amendment,* 4 Iowa Law Bull. 219, 220, 221 (1918) ("This narrower construction . . . renders it an idle provision, in that it only declares a principle already more amply and more simply expressed in the Constitution.").

7. Individual justices have from time to time relied upon the clause. See *e.g., Hague v. C.I.O.,* 307 U.S. 496, 512, 59 S.Ct. 954, 962, 83 L.Ed. 1423 (1939) (Roberts and Black, JJ. concurring).

8. *Sperry v. Florida,* 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), cited by Galahad, does not deal with the practice of law before the federal courts. It construes a federal patent statute permitting administrative practice by non-lawyers. Its holding is narrow and wholly inapposite.

lish standards for licensing practitioners and regulating the practice of professions. We also recognize that in some instances the State may decide that "forms of competition usual in the business world may be demoralizing to the ethical standards of a profession." *United States v. Oregon State Medical Society,* 343 U.S. 326, 336 [72 S.Ct. 690, 697, 96 L.Ed. 978] (1952).... The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." See *Sperry v. Florida ex. rel. Florida Bar,* 373 U.S. 379, 383 [83 S.Ct. 1322, 1325, 10 L.Ed.2d 428] (1963); . . . In holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act, we intend no diminution of the authority of the State to regulate its professions.

*Id.,* 421 U.S. at 792–793, 95 S.Ct. at 2015–2016 (citations omitted). The interest of the federal courts in similarly regulating the licensing and conduct of those attorneys who appear before them is expressly recognized by congressional enactment. 28 U.S.C. § 1654 reads as follows:

> In all courts of the United States the parties may plead and conduct their own cases personally *or by counsel as, by the rules of such courts, respectively, are permitted* to manage and conduct causes therein. [Emphasis added.]

Does one measure the § 1654 rule-making power of the federal courts using the yardstick of the Sherman Anti-Trust Act? The acts are constitutional equivalents. Particularly where Congress appears to have contemplated this kind of regulation by the courts, it is appropriate to displace anti-trust law in favor of appropriate court rules. Compare, *Princeton Community Phone Book, Inc. v. Bate,* 582 F.2d 706, 715–720 (3d Cir.1978) ("state action" exception). Rules for admission necessarily impose restrictions on the number of individuals who might otherwise engage in professional activity. Any government regulation of a trade or profession limits one's ability to compete in wholly free-handed fashion. Yet public policies beyond those embodied in the Sherman Anti-Trust Act certainly justify regulation of a profession that is "essential to the primary governmental function of administering justice," *Goldfarb v. Virginia State Bar,* 421 U.S. at 792, 95 S.Ct. at 2015, and is the repository of significant public confidence and trust.[9]

Local Rule 1(a) makes no effort to fix the fees of attorneys who practice before this Court. See *Goldfarb, supra.* Nor does it premise admission to practice upon an attorney's membership in the American Bar Association, or upon participation in activities of the state or local bar associations. Compare *Boddicker v. Arizona State Dental Ass'n,* 549 F.2d 626 (9th Cir.1977). It merely requires that applicants before this Court demonstrate an awareness of local law and practice through their performance on the bar examination, and satisfy the minimum standards of character and integrity required of those who practice before the coordinate system of state courts within this jurisdiction.

■ It is no less appropriate for this Court to make that requirement than it was for Pennsylvania or Alaska to have made it on prior occasions. Plaintiff's conclusory allegations regarding the bar examination process do not state a claim sufficient to survive a Rule 12(b)(6) challenge, at least so far as they are grounded in the anti-trust laws.

## V. DUE PROCESS CLAIMS

In his amended complaint, Mr. Galahad pleads that he is entitled to an order deleting Local Rule 1(a) from this Court's rules of practice on the ground that the Rule "has been, and is arbitrarily non-uniformly and discriminatorily applied." Amended Complaint, ¶ 20. He alleges that attorneys employed by the United States government are permitted to practice before this Court without compliance with Rule 1(a). Assuming that to be true, the complaint lacks

---

9. See *infra,* nn. 12–15 and accompanying text.

sufficient well-pleaded facts to justify inferring that such permission was in excess of the provisions of 28 U.S.C. § 515(a) (1976 ed.).[10]

 In any event, Galahad alleges the discriminatory *application* of Rule 1(a), a suitable basis for some remedies, but not one sufficient to justify the relief sought. Cf. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Unequal application of statutes or rules which are fair on their face is not a violation of the equal protection element of constitutional due process unless there is shown an element of intentional or purposeful discrimination, see *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), based upon an unjustifiable standard or an arbitrary classification. See *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

Galahad does not allege discrimination based upon any "suspect" classification; he ascribes no racial, religious, gender-based or political motivation to the defendants' conduct. Ultimately his due process claim must be read as an attack on the rational basis of Rule 1(a) and its logical connection to the goals and policies purportedly served.[11] "Somehow," plaintiff avers, "the judiciary has apparently become enormously emotionally attached to this dim lamp of the bar exams which they have expended and continue to expend, enormous efforts to polish." Memorandum at 17.

The relative lustre of the Colorado Bar Examination as applied to the plaintiff is the subject of a separate lawsuit. See *Galahad v. Woods,* No. 81–1104 (filed June 30, 1981). Plaintiff's own professional competence and personal integrity or character have not been questioned in this proceeding. Instead, Galahad asks this Court to hold—as a sweeping generalization—that the

"dim lamp" of the bar examination process casts unconstitutional shadows as a matter of law.

None of the authorities cited by the plaintiff lend support to his present assertion. With unfortunate irony, the cited cases list the bar examination as an alternative to be preferred over others, such as durational residency requirements:

> The [residency requirement] is not closely tailored to achieving familiarity with local rules and practices. There are other, less intrusive means to meet this end, *such as testing local rules on the bar examination,* . . .

*Piper v. Supreme Court of New Hampshire,* 539 F.Supp. 1064, 1073 (D.N.H.1982) (emphasis added); see also *Stalland v. South Dakota Board of Bar Examiners,* 530 F.Supp. 155, 159 (D.S.D.1982) ("[T]he requirement of a bar examination serves to determine an applicant's knowledge of state substantive law and procedural rules."). Plaintiff dismisses case law contrary to his arguments as demonstrating "that arrogant xenophobia is cherished dearly by the federal judiciaries." Memorandum at 19. He counters the existing precedents with expressions of philosophy, none of which suffice to make out a claim under the Due Process Clause.

Prior cases, such as *Matter of Roberts,* 682 F.2d 105 (3d Cir.1982), have turned away such challenges based upon analysis of due process very different from the one advanced by plaintiff. *Id.,* 682 F.2d at 107; see *O'Neal v. Thompson,* 559 F.2d 485 (9th Cir.1977); *Whitfield v. Illinois Board of Law Examiners,* 504 F.2d 474 (7th Cir. 1974); *Hawkins v. Moss,* 503 F.2d 1171 (4th Cir.1974); cf. *Application of Wasserman,* 240 F.2d 213 (9th Cir.1956). Plaintiff would expand the concept of "liberty" to require a

---

**10.** That section provides that:

 (a) The Attorney General, or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, *conduct any kind of legal proceeding, civil or criminal,* including grand jury proceedings and proceedings before committing magistrates,

*which United States attorneys are authorized to conduct whether or not he is a resident of the district in which the proceedings is brought.* [Emphasis added.]

**11.** The bulk of the plaintiff's discussion of his due process claim addresses the rational basis of the bar examination process. See Memorandum at 14–17.

uniform rule of admission to practice before all of the federal district courts. While the idea of a uniform admissions rule has been proposed and discussed, it has not been adopted. See Report to the Jud.Conf. of the U.S., Standards for Admission, 79 F.R.D. 187 (1978) (The Devitt Committee Report); 8 Fed.Proc., L.Ed. *Courts* § 20.144 at 274 (1982). Nor has it been promoted to the magnitude of a constitutional norm. Indeed, a district court retains "broad discretion concerning admission to practice before it." *Raiford v. Pounds,* 640 F.2d 944, 946 (9th Cir.1981); see *Hicks v. Committee on Admissions,* 439 F.Supp. 302, 304 (E.D. Tenn.1977). Many district courts have adopted rules similar to Rule 1(a) and have applied them for years. 8 Fed.Proc., L.Ed. *Courts* § 20.144, at 273 & n. 94 (1982). A few have adopted much more lenient requirements demanding good character and the fact of prior admission to the bar of any federal district court. See *e.g., id.;* Rule 5(a), Local Rules, United States District Court for the District of Massachusetts (1978).

■ The Federal Rules of Appellate Procedure liberally premise the admission of counsel to practice before the Court of Appeals upon prior admission

before the Supreme Court of the United States, or the highest court of a state, or *a United States district court, . . .*

Rule 46(a), Federal Rules of Appellate Procedure (emphasis added).[12] The Supreme Court, on the other hand, requires bar applicants to have been

admitted to practice in the highest court of a State, Territory, District, Commonwealth, or Possession for the three years immediately preceding the date of application, . . .

Rule 5.1, Supreme Court of the United States Revised Rules (1981).[13] Local Rule 1(a) plainly satisfies the mandate of 28 U.S.C. § 2071 that such rules shall be consistent with "rules of practice and procedure prescribed by the Supreme Court;" though substantively similar, it is plainly less burdensome. Nor can an Act of Congress be pointed out that is directly contrary to the substance of the Rule. As noted above,[14] 28 U.S.C. § 1654 expressly empowers the federal courts to make rules governing the admission of counsel to practice.

■ The general rule of practice under that section among the district courts was capsulized in Justice Frankfurter's observation that "a lawyer is admitted into a federal court by way of a state court . . . ." *Theard v. United States,* 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957), usually the highest state court within the district [15]. 8 Fed.Proc., L.Ed. *Courts* § 20:144, at 273 (1982). This route almost always requires satisfactory performance on a bar examination.

■ Certainly it can be said that American constitutional law is not static, and that changing factual circumstances, "the lessons of experience," or new perceptions of

---

**12.** Rule 46 additionally requires that the applicant be "of good moral and professional character," as borne out in a written personal statement and the motion of a member of the bar of the Court of Appeals.

**13.** Rule 5.2 further requires that

[e]ach applicant shall file with the Clerk (1) a certificate from the presiding judge, clerk, or other duly authorized official of the proper court evidencing the applicant's admission to practice there and present good standing, and (2) an executed copy of the form approved by the Court and furnished by the Clerk containing (i) the applicant's personal statement and (ii) the statement of two sponsors (who must be members of the Bar of this Court and must personally know, but not be related to,

the applicant) endorsing the correctness of the applicant's statement, stating that the applicant possesses all the qualifications required for admission, and affirming that the applicant is of good moral and professional character.

**14.** See discussion of the antitrust laws, *supra.*

**15.** Of course, even "[t]hough admission to practice before a federal court is derivative from membership in a state bar," the federal courts maintain independent control over admission, discipline and disbarment of attorneys in the federal courts. *In re Ruffalo,* 390 U.S. 544, 547, 88 S.Ct. 1222, 1224, 20 L.Ed.2d 117 (1968).

constitutional history or societal values are important factors in the evolution and growth of the law. See P. Brest, Processes of Constitutional Decisionmaking 1121–1126 (1975). It can also be said that the present bar admission procedures in the federal district courts are not an airtight guarantee of high quality performance by counsel. See *e.g.,* Report on Standards for Admission, *supra,* 79 F.R.D. at 193–195. Saying that a procedure is imperfect, however, is not tantamount to saying that it lacks "a rational connection with the applicant's fitness or capacity to practice law." *Schware v. Board of Bar Examiners of New Mexico,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). Those who have considered the problems have recommended an *expansion* rather than an elimination of the bar examination for federal bar admissions. See Report on Standards for Admission, *supra,* 79 F.R.D. at 195–196. To the extent that the plaintiff bases his due process claims upon his general challenge to the bar examination process, his complaint fails to state a claim for which relief may be granted.

Mr. Galahad assumed an awesome burden as the plaintiff in this action. Only three years ago, the Supreme Court observed that "the Constitution does not require that because a lawyer has been admitted to the bar of one State, he or she must be allowed to practice in another." *Leis v. Flynt,* 439 U.S. 438, 443, 99 S.Ct. 698, 701, 58 L.Ed.2d 717 (1979) (per curiam). The case law refuting the existence of such a requirement in the federal courts is recent in time and without evidence of erosion. See *e.g., Matter of Roberts,* 682 F.2d 105 (3d Cir.1982); *O'Neal v. Thompson,* 559 F.2d 485 (9th Cir. 1977); cf. P. Brest, Processes of Constitutional Decisionmaking 1126–1129 (1975).[16]

The power of the federal courts to make rules regarding admission to practice is as old as the Republic itself. Section 35 of the Judiciary Act of 1789, Act of Sept. 24, 1789, ch. 20, 1 Stat. 73, 92, declared

That in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of *such counsel or attorneys at law as by the rules of said courts respectively shall be permitted to manage and conduct causes therein.* [Emphasis added.]

That enactment, which preceded the proposal in Congress of the Sixth Amendment by one day, has remained in the Judicial Code in essentially unchanged form ever since.[17] It now is codified as 28 U.S.C. § 1654. "This statute gives more elaborate expression to the meaning of the terse language of the Bill of Rights" concerning rights to the assistance of counsel. *United States v. Plattner,* 330 F.2d 271, 274 (2d Cir.1964). It was enacted to guarantee those rights of a time when there was a "current state of incertitude regarding the probability of constitutional amendment." J. Goebel, Antecedents and Beginnings to 1801, 1 History of the Supreme Court of the United States 490 (1971).

It is a very long step to conclude that members of the First Congress, many of whom had been members of the federal constitutional convention, set about to grant rulemaking power to the courts that would violate the due process guarantee of the Fifth Amendment that they would soon submit for ratification. The consistent tradition of the grant and exercise of that power since 1789 may itself provide a contemporaneous interpretation of due process and § 1654 that carries great weight. As the Supreme Court has said of an earlier challenge,

To this objection, which is of recent date, it is sufficient to observe, that practice, and acquiescence under it, for a period of several years, commencing with the or-

---

**16.** The only currently fruitful instances of challenge to bar admission rules seem to revolve around First Amendment issues not raised in this action. See *e.g., In re Stolar,* 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971) (plurality opinion).

**17.** For a short period following the 1948 revision of the Judicial Code, the language regarding court rules was deleted, but it was quickly reinstated to that section by a 1949 amendment. Act of May 24, 1949, C. 139 § 91, 63 Stat. 103.

ganization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. . . .

*Stuart v. Laird,* 5 U.S. (1 Cranch) 299, 308, 2 L.Ed. 115 (1803).

Rulemaking by the courts within their power under 28 U.S.C. § 1654 may prove inconvenient, even somewhat burdensome to counsel migrating from district to district. That alone does not make it unconstitutional. Perhaps a policy of universal admission to the bar of the district courts will achieve constitutional stature at some time in the future. Or perhaps not. As Justice Blackmun has recently concluded about a very similar claim,

> That kind of reasoning would compel one to conclude that because an applicant is admitted to the Bar of one State, he surely must be admitted to the Bar of any other State. We might reach that frontier one day on some new and as yet undeveloped constitutional concept, but I doubt whether we have reached it yet. . . .

*In re Stolar,* 401 U.S. 23, 33, 91 S.Ct. 713, 718, 27 L.Ed.2d 657 (1971) (Blackmun, J. dissenting).

## VI. A NOTE OF RIPENESS

At hearing on the motions to dismiss, counsel for the defendants additionally urged dismissal of this action on the theory that it was not ripe for adjudication: the plaintiff's other federal lawsuit, *Galahad v. Woods,* No. 81–1104 (filed June 30, 1981), may ultimately render him eligible for admission under the terms of Rule 1(a), presenting mootness problems in any further proceedings in this action. Until the potential mootness question is resolved, counsel asserted, this action is premature, i.e., "unripe."

This argument wholly blurs the concepts of ripeness and mootness. Both are distinct analytical concepts, grounded upon different concerns. See H. Hart & H. Wechsler,

The Federal Courts and the Federal System 102–149 (2d ed. Bator 1973); *id.,* 1981 Supplement, at 20–52 (Bator ed. 1981). That a current controversy may become moot at some time in the future in no way compels this or any other court to do nothing while we wait and see. For whatever value it has, the plaintiff's theories of constitutional right as applied to the existing state of affairs generate a concrete controversy appropriate—and ripe—for judicial determination. The motion to dismiss, insofar as it rests on ripeness, shall be denied.

## VII. A FINAL NOTE

It would be useful to at last observe that the plaintiff's individual character and competence in the practice of law *are not at issue.* The consequences of his membership in the bar of other courts and the legal soundness of Local Rule 1(a) have been in question and have been resolved against him. An adverse outcome as to these latter issues, all must concede, has no bearing on those issues more personal to Mr. Galahad. Those questions must find their answers on some separate, future occasion.

For the reasons stated in this opinion, the defendants' motion to dismiss this action pursuant to Rule 12(b)(6) shall be GRANTED. The amended complaint in the above-entitled proceeding shall be DISMISSED.

## JUDGMENT

Pursuant to the Opinion heretofore filed, Plaintiff's complaint is hereby DISMISSED.